**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL J. MARONEY, as Trustee of Premiere Realty Trust, and MARONEY CONSTRUCTION COMPANY, INC., Plaintiffs, | |
| v. | No. 16-CV-11575-DLC |
| JAMES J. FIORENTINI, Individually and in his Capacity as Mayor of the City of Haverhill, ROBERT E. WARD, Individually and in his Capacity as Deputy Director of Public Works of the City of Haverhill, Water/Wastewater Division, and THE CITY OF HAVERHILL, Defendants. | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

CABELL, U.S.M.J.

This case arises from efforts by Michael J. Maroney ("Maroney") to develop a subdivision of homes in the City of Haverhill ("the City"). Having been denied certain permits, Maroney filed this action through his business entities against the City and two City officials for violations of 42 U.S.C. § 1983 ("section 1983") and Massachusetts state law.[1]

---

[1] Maroney filed suit as Trustee of Premiere Realty Trust, and in the name of his company, Maroney Construction Company, Inc. For ease of reference, the court uses "Maroney" or "the plaintiff" in the singular form to refer to these entities.

The defendants, Robert E. Ward ("Ward"), deputy director of the City's Department of Public Works ("the Water Department"), and James E. Fiorentini, the City's mayor, ("the Mayor") (collectively "the defendants"), move for summary judgment on the remaining claims in the operative amended complaint ("operative complaint") (D. 51). (D. 95). These claims are: a violation of substantive due process under section 1983; a violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I ("MCRA"); interference with contractual or economic relations; and civil conspiracy. (D. 51).

The defendants argue that Ward and other City officials denied permits and refused to sign off on site plans because of Maroney's delay in designing and building a water booster station to serve the subdivision's homes. Relatedly, so they contend, Maroney never submitted a final revised design of the station after October 2013 as required by the City and its outside engineering firm. The defendants further submit that Maroney never provided a compliant design after Ward required a different pumping system in January 2016. (D. 96, 110).

The plaintiff argues in opposition that Ward repeatedly denied permits and imposed unfounded requirements without a reasonable basis with respect to designing and building the water booster station. The plaintiff also contends that the Mayor made threats to Maroney to drop a July 2015 state court lawsuit Maroney

filed to secure the necessary permits to develop the subdivision. Ward purportedly carried out those threats by continuing to deny permits, changing the pumping system design in January 2016, and opposing an extension of time to construct the water booster station in the fall of 2016.

In response, the defendants argue that Ward acted the same before and after Maroney filed the state court lawsuit. For the reasons that follow, the summary judgment motion (D. 95) is allowed in part and denied in part. In particular, the motion is allowed as to Ward, and allowed as to the Mayor except for the interference with contractual or economic relations claim.

## I.   STANDARD OF REVIEW

Entitlement to summary judgment requires the movant to demonstrate "there is no genuine dispute as to any material fact." *Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 503 (1st Cir. 2022) (citation omitted). If the movant is "able to make a showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party, who must, with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." *Id.* (citation omitted); *see Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) ("[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to

generate a trialworthy issue warrants summary judgment.")
(citation omitted).

The record, including all reasonable inferences, is viewed in
the nonmovant's favor. *See Motorists Com. Mut. Ins. Co. v.
Hartwell*, 53 F.4th 730, 734 (1st Cir. 2022). Uncontroverted
statements of fact in the movant's L.R. 56.1 statement comprise
part of the summary judgment record. *See, e.g., Cochran v. Quest
Software, Inc.*, 328 F.3d 1, 12 (1st Cir. 2003). Viewed under the
foregoing standard, the facts are as follows.

## II.  BACKGROUND

### A.  Subdivision Approval with Water Booster Station

In 2009, Premiere Realty Trust ("Premiere") purchased
property in Haverhill to build a subdivision of homes known as
Crystal Springs Cluster ("Crystal Springs"). (D. 104, ¶ 6).[2]
Premiere owned the land and the Maroney Construction Company, Inc.
("Maroney Construction") was the general contractor. In addition
to being Premiere's trustee, Maroney is the president of Maroney
Construction. (D. 104, ¶¶ 1-3). As designed, the project
consisted of 50 residential lots:  16 on a private way known as

---

[2] The above filing contains both the defendants' L.R. 56.1 paragraphs and the
plaintiff's responses to those paragraphs. (D. 104). Unless designated as a
"Response," a citation to a paragraph includes the portion of the plaintiff's
response which does not dispute or controvert the defendants' paragraph.

Back Nine Drive and 34 on a private way known as Front Nine Drive. (D. 97-13, p. 26).[3]

In March 2009, the Planning Board for the City of Haverhill ("the Planning Board" or "the Board") held a meeting regarding Maroney's application for a special permit to develop Crystal Springs. During the meeting, Maroney acknowledged the City's "concerns about water pressure" and "proposed building a water booster station" to address the concerns. (D. 104, ¶ 8). In fact, Maroney agreed a booster station would be needed to meet water pressure and fire hydrant flow requirements. (D. 104, ¶ 9).

In a May 2009 letter, the Water Department's outside engineering firm, Wright-Pierce, provided an analysis of the effect of the subdivision on the City's water supply. (D. 97-4, pp. 14-15). Without identifying specific lots, Wright-Pierce concluded that higher elevations in the subdivision could not be served without providing supplemental water boosting. (D. 97-4, pp. 15-17). The lots on Front Nine Drive have higher elevations than the lots on Back Nine Drive. (D. 97-2, pp. 13-14).

When the Mayor initially learned about the development in or around 2009 from William Pillsbury ("Pillsbury"), the City's planning director, the Mayor supported the project. In fact, the Mayor stated he was "all for it." (D. 97-12, p. 31).

---

[3] Except for depositions, page numbers refer to the page number in the upper right-hand corner of the docketed filing.

In January 2010,[4] the Planning Board approved the subdivision plan with the inclusion of documents from the Water Department "about the need for the water booster station."  (D. 104, ¶ 10). The approved definitive subdivision plan required Maroney to build a water booster station.  (D. 97-2, p. 86) (D. 97-4, pp. 93-94). Notably, the definitive plan did not set a deadline or a segmented timeline to complete construction of the booster station.[5]  (D. 104-3, p. 27).  The plan did, however, allow Maroney to post a security bond for the water booster station or to build the station, according to John A. D'Aoust ("D'Aoust"), the City's water treatment plant manager.[6]  (D. 104-3, p. 98, ln. 6-8, 15-18).

## B.   Timing to Build Station, Form F, and Tri-Partite Agreements

In a prior opinion, the court determined that Maroney is estopped from arguing that he had until November 2016 to build the water booster station.  (D. 77, p. 12).  Rather, he agreed to build the station after completing Phase I, which was earlier than

---

[4] The verified operative complaint (D. 51, ¶ 11) states that the Planning Board approved the plan in January 2010.  S*ee Sheinkopf v. Stone*, 927 F.2d 1259, 1262-1263 (1st Cir. 1991).

[5] The parties dispute the timing of "when the station needed to be built" (D. 104, ¶¶ 9, 12, Responses), particularly the plaintiff (D. 105, p. 2) ("[T]he timing [of] when the station needed to be built is very much disputed.").

[6] The pertinent language reads as follows:  "No building permit will be issued until all of the utilities shown on the plans to provide service to the proposed structure are installed and tested, *or* a security bond is posted for such work." (D. 97-13, pp. 7, 25) (emphasis added).

November 2016.[7]  (D. 77, p. 12).  Accordingly, Maroney agreed to build the station earlier than November 2016.

In June 2009, Maroney executed the Planning Board's "Form F Covenant" for all lots in the subdivision.  (D. 97-13, pp. 22-23). The form set a June 12, 2011 deadline for Maroney to complete the installation of "municipal services," which, by definition, included utilities such as the water booster station.  (D. 97-13, p. 23) (D. 104-3, p. 98).  Importantly, the form imposed a condition which required the installation of municipal services before any lot in the subdivision "may be built upon."  (D. 97-13, p. 22).

As stated in the form, the Planning Board would release lots from this condition if the Board executed a performance guarantee "enumerating the specific lots to be so released."  (D. 97-13, p. 23).  In this regard, the Planning Board, Maroney, and Pentucket Bank (or the Lowell Five Cents Savings Bank) ("the bank") entered into successive Tri-Partite Agreements under which the Planning Board agreed to release certain enumerated lots from "any and all covenants," such as Form F, in return for the bank issuing

---

[7] Regardless of the timing dispute Maroney identifies as to "when the station needed to be built" (D. 105, pp. 2-3), the fact remains he is estopped from arguing that he had until November 2016 to build the station.  (D. 77, p. 12). Further, and in any event, the purported misconduct does not give rise to a violation of substantive due process or MCRA, as explained in the discussion section.

irrevocable lines of credits designating the Planning Board as the sole beneficiary.  (D. 97-13, pp. 26-47).

By way of example, in the first Tri-Partite Agreement dated June 8, 2010, the bank agreed to issue an irrevocable letter of credit to the Planning Board, the Planning Board released 16 enumerated lots on Back Nine Drive from "any and all covenants," and the parties extended the deadline for Maroney to install municipal services to January 28, 2012.[8]  (D. 97-13, p. 27).  The last Tri-Partite Agreement extended the deadline to install municipal services to October 1, 2016.[9]  In essence, the letters of credit described in the Tri-Partite Agreements served as performance guarantees or security bonds to complete the installation of municipal services to adequately serve the houses on the released lots.  (D. 97-13, pp. 26-27, 31, 34-35, 44-45).

To explain the construction approval process, the release of lots by the Planning Board under the Tri-Partite Agreements operated on a "separate track" from the permitting process by the City's departments.  (D. 97-24, pp. 17-18); *see City of Haverhill*

_____

[8] As previously noted, "municipal services" encompasses the water booster station.

[9] Although the agreement recites the October 1, 2016 deadline under which Maroney "shall complete" the installation of municipal services, it also contemplated a November 1, 2016 deadline.  In that vein, the agreement reads that if the "installation of municipal services is not completed" by November 1, 2016, the Planning Board may draw on any undisbursed funds under the letter of credit to complete the remaining work.  (D. 97-13, p. 45).  The Board's Counsel advised the Board of this interpretation in the fall of 2016.  (D. 97-24, p. 22).

*Rules and Regulations Governing the Subdivision of Land*, §§ IV.C, IV.F (June 14, 2000) (captioned Filing Requirements, Lot Release Procedure and Construction of Subdivision), https://www.cityofhaverhill.com/departments/economic_development _and_planning/subdivision_of_land.php#revize_document_center_rz4 7 ("*Haverhill Subdivision Rules*").[10]   After the Planning Board releases a lot, the developer submits a site-plan application to the Engineering Department.   The applicable City departments, which here include the Water Department, will then "weigh in" or "sign off" on the application to indicate their approval or disapproval.  (D. 104-3, p. 46) (D. 104-7, p. 90) (D. 97-1, p. 9, n.14); *see Haverhill Subdivision Rules*, § IV.F.1.   If the site plan is approved for the released lot or lots in question, the developer may proceed to obtain the necessary building and other permits from the applicable departments to construct houses on the released lots.  (D. 104-3, p. 46) (D. 104-7, p. 90) (D. 97-1, p. 9, n.14); *see Haverhill Subdivision Rules*, § IV.F.1.   Ward therefore "had to sign off on the site plans in order for" Maroney to obtain building permits to begin construction.  (D. 104, ¶ 86).

As noted, the parties disagreed about the deadline for Maroney to complete the water booster station.  In October 2012, Maroney

---

[10] The court's ability to take judicial notice encompasses the City's Rules and Regulations Governing the Subdivision of Land posted on the City's website. *See Getty Petroleum Mktg., Inc. v. Cap. Terminal Co.*, 391 F.3d 312, 321 n.24 (1st Cir. 2004) (Lipez, J., concurring) (collecting cases taking judicial notice of city building code and town ordinances).

and Ward met to discuss the timing of the station's construction. (D. 97-4, pp. 31-32).  In that vein, Maroney sent an October 17, 2012 letter with his schedule to D'Aoust.[11]  (D. 104-1, p. 220) (D. 104-2) (D. 104-3, p. 11) (D. 97-4, pp. 31-32).  As set out in the letter, the schedule consisted of building houses on Front Nine Drive "in three phases" consisting of 13 houses in the first phase, 11 houses in the second phase, and ten houses in the third phase.  (D. 104-2).  According to Maroney's schedule, Maroney would build or commence the process of building the water booster station upon completing the first phase of 13 houses.[12]  (D. 104, ¶ 13) (D. 104-2) (D. 104-1, pp. 220-221).  In contrast, in May 2012, D'Aoust understood Maroney would complete the station's construction "before the homes were built on Front Nine Drive." (D. 104-3, pp. 32, 38).  In May 2012, Ward expected the water booster "station to be done before occupancy of Front Nine" Drive houses.  (D. 97-4, pp. 28, 31).  Subsequent attempts between Maroney and Ward and/or D'Aoust to agree on a schedule were not successful.

As noted, the last Tripartite Agreement required Maroney to install the water booster station no later than November 1, 2016.[13]

---

[11] Ward knew about the schedule in the October 17, 2012 letter.  (D. 97-4, pp. 31-32) (D. 104-2).

[12] *See supra* note 7.

[13] *See supra* note 9.

Further, Maroney is estopped from arguing he had until November 2016 to build the station.

C.  **Maroney's Progress in Building Station Prior to March 2015**

Between 2009 and 2012, Maroney built approximately ten or 11 houses on Back Nine Drive.  Correspondingly, Ward accommodated a request from Maroney's engineer by allowing Maroney to build these and all other houses on Back Nine Drive lots without installing the water booster station.  (D. 97-4, pp. 19-20).

In 2013, the City initially wanted Maroney to use a water booster station based on a "skid design" with a "pumping system designed by either EFI or SyncroFlo," the two suppliers of pumping systems specified in the City's pumping station requirements.[14] (D. 97-4, p. 41) (D. 104, ¶ 17).  The "factory-built" skid design consisted of pumps and control panels mounted on a skid.  (D. 97-4, pp. 41-42).  In lieu of using the skid design, Maroney proposed using "a built in place station," also referred to as "a field built station."  (D. 104-4, ¶ 4) (D. 104, ¶ 18).  Ward and D'Aoust allowed Maroney to propose "a field built station," which they would "take a look at it" and consider.  (D. 97-4, p. 47) (D. 104-3, pp. 11, 71) (D. 104, ¶ 18).  Relatedly, Ward and D'Aoust approved

---

[14] Under the *Haverhill Subdivision Rules*, the Water Department "determine[s] the areas where booster pumping is required."  *Haverhill Subdivision Rules*, § V.5.2.5.  Furthermore, "[p]umping stations shall be designed and constructed in accordance with" the Water Department's requirements.  *Id.;* (D. 97-3).

the qualifications of Bruce Lewis ("Lewis"), Maroney's engineer, to design the built in place station. (D. 104-4, ¶ 4).

Lewis submitted a preliminary design for the water booster station to D'Aoust in early June 2013 and a "proposed final plan" to D'Aoust in late July 2013. (D. 104-4, ¶¶ 3, 6). After receiving comments by Wright-Pierce, Lewis submitted a revised plan on September 26, 2013. (D. 104-4, ¶ 7). In an October 30, 2013 memorandum to D'Aoust and Ward, Wright-Pierce reviewed the revised design and added comments. (D. 97-6). D'Aoust, in turn, forwarded the memorandum and a cover letter to Lewis on October 30, 2013. In no uncertain terms, the memorandum states that, "A site plan was not included as part of the resubmittal and is *required* prior to final approval." (D. 97-6, p. 3, § 3) (emphasis added). Even Lewis noted that "Shop drawings for all materials needed to be submitted to Wright-Pierce for review and approval prior to construction." (D. 104-4, ¶ 9). It is undisputed that the "Wright-Pierce Memorandum did not approve" the revised, resubmitted design. (D. 104, ¶ 22). Maroney also acknowledged that the September 26, 2013 revised plan reviewed by Wright-Pierce in the October 30, 2013 memorandum ("the revised plan") was "the *last* time [he and Lewis] submitted" design plans to the City "for the water booster station." (D. 97-2, pp. 39-40) (emphasis added).

By late October 2013, Maroney knew that Wright-Pierce did not approve the revised design because D'Aoust copied him on the

October 30, 2013 email to Lewis which attached Wright-Pierce's memorandum.  (D. 97-6).  Against the backdrop of the accompanying cover letter, Maroney also knew he had to submit an additional final set of design plans to obtain the City's approval.  The cover letter reads as follows:

> There are a few items to be addressed.  One of importance is the site plan, the memo will indicate what is needed . . . Please address these items in *one final set of design plans and specifications* that will be adequate for the city and MassDEP approval.

(D. 96-6) (emphasis added).[15]  Maroney did not submit a revised final set of design plans to the City addressing these items.[16]

## D.   Ward's Spring 2015 Refusals to Approve Permits and Water Service Applications

By September 2014, the Planning Board had released 20 lots along Front Nine Drive and set the aforementioned November 1, 2016 deadline for Maroney to install, inter alia, the water booster station.  (D. 97-13, pp. 34-35, 44-45).  In March 2015, however, Ward refused to approve "water service applications that were being

---

[15] Notwithstanding the above, Lewis understood "that the design [of the water booster station] was essentially complete and acceptable" by virtue of the cover letter and attached memorandum.  (D. 104-4, ¶ 8).  Maroney considered the revised plan as 95% complete.  (D. 92-2, pp. 21-23, 33, 78, 153).

[16] As indicated below, Maroney points out, and the record supports, that he and Lewis brought the same plans to a January 5, 2016 meeting with Ward and D'Aoust. Maroney acknowledges that he did not "pull the plans out at the meeting."  (D. 97-2, p. 77).  He further testified that nothing was stopping him from October 30, 2013 to January 5, 2016 from submitting revised, final design plans for the City's review.  (D. 97-2, p. 140).

requested for various homes on Front Nine Drive."[17]  (D. 104, ¶ 28) (D. 97-4, pp. 80, 94).  Ward "did not speak with the Mayor before stating that there would be 'no more approvals'" for such applications.  That said, Ward may have updated him at one of their weekly meetings.  (D. 104, ¶ 30) (D. 97-4, pp. 79-80, 82-83).  Ward based his decision on the lack of progress on the water booster station.  (D. 97-4, p. 94).  Similarly, "[a]s of April 2015, Ward" refused to "sign off on additional permits because" he believed "Maroney had not done enough work toward the water booster station."  (D. 104, ¶ 30) (D. 97-2, p. 53).

During a meeting the same month, Maroney, Ward, D'Aoust, Pillsbury, and Maroney's attorney discussed a schedule for the station's construction and tried to arrive at an agreement.[18]  (D. 104, ¶ 32) (D. 97-2, pp. 52-53).  After the meeting, a proposed agreement was sent to Ward containing Maroney's suggested schedule to complete the water booster station "by the effective bond date."  (D. 97-2, pp. 53-55, 57) (D. 97-10, p. 4).  In pertinent part, the proposed agreement stated that "the Water Department shall share the new Hydraulic Analysis Report (2015) with the builder upon its

---

[17] At the time and as pointed out by the plaintiff, Ward did not know which lots on Front Nine Drive met the City's minimum water pressure standard (35 psi). (D. 97-4, pp. 81, 84).  It was not until May 2015 that Wright-Pierce provided the City with an analysis of which lots met the minimum requirement such that they were serviceable without a water booster station.  (D. 97-4, pp. 103-104).

[18] Previous attempts in the preceding two years to arrive at an agreed schedule were unsuccessful.  (D. 97-2, pp. 33-36) (D. 104-1, pp. 206-207).

receipt of the same." (D. 97-2, p. 57) (D. 104, ¶ 33) (D. 97-10, p. 3). Maroney declined to sign the proposed agreement because the City already had the hydraulic analysis report from Wright-Pierce but would not provide it to Maroney before he signed the agreement.[19] (D. 97-2, pp. 58-61) (D. 104, ¶ 34).

After the failure to execute the proposed agreement, "Ward refused to sign off on any additional building permits" for Crystal Springs. (D. 104, ¶ 38). In fact, Ward testified that after March 2015 the Water Department did not "sign off on anything else to allow any other homes to be built in the Crystal Springs subdivision." (D. 97-4, pp. 115-116). Notwithstanding Ward's refusals, "Maroney proceeded to build" houses on a number of lots on Front Nine Drive "without building permits" for a six-week period in June and early July 2015. (D. 104, ¶ 39) (D. 97-2, pp. 123, 126, 128). This, in turn, led the City's Building Inspector to issue Maroney a stop-work order on July 15, 2015, and Maroney stopped building on the lots. (D. 104, ¶ 40) (97-4, pp. 111, 166-167, 169) (D. 97-2, p. 121). By this time, Maroney had completed the houses on Back Nine Drive. (D. 104-7, pp. 68-69) (D. 104-6, p. 77) (D. 97-2, p. 207).

---

[19] The plaintiff moves to strike the following from the defendants' undisputed statement of material facts: "[N]either Ward nor the Mayor made the decision not to share the hydraulic analysis report with Maroney." (D. 102) (D. 97, ¶ 36). Striking or failing to credit the paragraph would not alter the court's decision on the summary judgment motion regarding any of the remaining claims.

**E.**  **State Court Action and the Mayor's Statements**

On July 23, 2015, Maroney filed suit in Massachusetts Superior Court (Essex County) against Ward, the Planning Board, and various Haverhill officials, albeit not the Mayor, for impeding Maroney's development of Crystal Springs and refusing to issue permits and approve site-plan applications.  (D. 104, ¶ 41) (97-13, pp. 2-3). Although not a party, the Mayor knew about the lawsuit and remembers receiving the complaint after it was served.  (D. 97-12, p. 109).  Up until the time Maroney filed the lawsuit, he had no reason to believe the Mayor "was trying to stop the project." (D. 97-2, pp. 230-231).

Shortly after Maroney filed the lawsuit, the Mayor had an August 2015 meeting with Crystal Springs residents, another August 2015 meeting with a close friend of Maroney's, and a September 2015 meeting with Maroney.  At all of these meetings, the Mayor in essence stated that Maroney needed to drop the state court lawsuit to obtain the permits for the development.

More specifically, in August 2015, Rosemary Scalera ("Scalera"), a real estate broker and resident of Back Nine Drive, organized a meeting with the Mayor and various Crystal Springs residents and prospective buyers who were concerned about the work stoppage.  (D. 104-7, pp. 25, 27, 103, 107).  A Front Nine Drive resident described the meeting's purpose as "[g]etting permits" for Front Nine Drive lots or houses.  (D. 104-6, pp. 83, 90).

Maroney knew about the meeting but did not attend.  (D. 104-7, p. 104).  The Mayor, however, knew Scalero was the real estate broker for the houses of the attendees on Front Nine Drive and assumed she was a broker for Maroney.  (D. 97-12, pp. 115-116, 144-145). During the August 27, 2015 meeting, the Mayor acknowledged:  the water booster station as part of the definitive plan, the lack of a timeline to build the station, the option Maroney had "of building or bonding" the station, the existence of the bond, and the November 2016 expiration of the bond.  (D. 104-7, pp. 110-111, 114).  The Mayor then stated that "Maroney knows what he has to do" to get the permits, and "[i]f he drops the lawsuit, he'll get the permits."[20]  (D. 104-7, p. 112) (D. 104-6, pp. 91-93).  There "was no talk about settling the lawsuit during the meeting," according to Rosemary Deyermond ("Deyermond"), a Front Nine Drive resident who attended the meeting.[21]  (D. 104-6, p. 93).  She characterized the Mayor's statement as extortion.  (D. 104-6, p. 94).

In late August 2015, the Mayor met with Francis Healey ("Healey"), who the Mayor knew was Maroney's friend, about the

---

[20] Whereas the Mayor denied making these statements (D. 97-12, pp. 116-117), the record is viewed in the plaintiff's favor.

[21] In contrast, the Mayor, an attorney for 30 years, testified that either he or Bill Cox, the City solicitor, said something to the effect that "Maroney needs to settle the lawsuit."  (D. 97-12, pp. 54, 119).  Here again, the record is construed in the plaintiff's favor.

Crystal Springs development.  (D. 104-8, pp. 59-60).  During the ten-minute meeting, Healey posited there must be a means to solve the situation "in a better way to help the taxpayers."  (D. 104-8, p. 62).  In response, the Mayor said, "[T]ell Maroney to drop the lawsuit, and I'll give him as many permits as he wants, but if he doesn't, then he'll never get any permits while I'm a Mayor."[22] (D. 104-8, p. 62).

On or about September 11, 2015, the Mayor met with Maroney in the Mayor's office.  At the outset, the Mayor noted that Maroney did not bring his attorney and then stated, "What can we do to resolve this problem?"  (D. 97-2, p. 121) (D. 104, ¶ 47).  Maroney responded, "Give me my permits."  (D. 97-2, p. 121) (D. 104, ¶ 47).  The Mayor then slid a piece of paper across the table whereupon Maroney asked, "What is this?"  (D. 97-2, p. 121) (D. 104, ¶ 47).  The Mayor responded, "That's what you owe the City, you owe the City $250,000."  (D. 97-2, p. 121) (D. 104, ¶ 47).  Maroney asked, "For what?"  (D. 97-2, p. 121) (D. 104, ¶ 47).  In response, the Mayor said, "For all those houses you built illegally without permits."  (D. 97-2, p. 121) (D. 104, ¶ 47).

Maroney then explained there are "no fines on the illegal building because there's a stop work order and I didn't go back to work on any of them.  So there is no fee, no $1,000 a day unless

---

[22] As before, although the Mayor denies making the statement (D. 97-12, p. 149), the record is viewed in the plaintiff's favor.

I do . . . [and] I'm not dropping the lawsuit."  (D. 97-2, p. 121)
(D. 104, ¶ 47).   The Mayor replied, "you can have . . . all the
permits you want, just drop the lawsuit."  (D. 97-2, pp. 121-122)
(D. 104, ¶ 47).  When Maroney refused, the Mayor responded, "Well,
you say we owe you money[,] and I say you owe us money, so why
don't we just call it a day[?]"  (D. 97-2, p. 122) (D. 104, ¶ 47).
Maroney denied he owed any money and reaffirmed he was "not
dropping any lawsuit."  (D. 97-2, p. 122) (D. 104, ¶ 47).  Before
the meeting ended, the Mayor told Maroney, "You can dismiss the
case and you can have all the permits you want . . . [a]nd we'll
make these fines go away."[23]  (D. 97-12, p. 123).

     At the Mayor's request, the two met again a few days later.
(D. 104, ¶ 49).  During the meeting, the Mayor said he "would like
to go to mediation" and wanted Maroney "to think about it."  (D.
97-2, p. 132) (D. 104, ¶ 49).  Maroney initially declined to go to
mediation.  (D. 104, ¶ 50).  On September 25, 2015, however, he
emailed Ward a proposed agreement between Maroney and the Mayor.
The Mayor never signed the agreement.  (D. 104, ¶¶ 51-52).

**F.   Change to EFI Pumping System and Maroney's Efforts to Comply**

     In or around November 2015, Maroney constructed a new water
main line to support the water booster station.  (D. 97-2, pp. 86-
87) (D. 97-4, p. 115).  Ward acknowledged the installation of the

---

[23] Maroney viewed the above statement as extortion because he knew that he did
not owe the fines.  (D. 97-12, p. 123).

water main line and recalled Maroney telling him the cost was $150,000 to $160,000. (D. 97-4, pp. 101-102). On January 5, 2016, Maroney and Lewis attended the meeting with Ward and D'Aoust and brought the revised set of design plans submitted to the City in late September 2013 and reviewed by Wright-Pierce in October 2013.[24] (D. 97-2, pp. 39, 41, 75, 77-78). At the meeting, however, "Ward told Maroney and Lewis that they needed to go with the EFI pumping system," and, as a result, Maroney and Lewis "didn't even pull the plans out." (D. 104, ¶ 56) (D. 97-2, p. 77).

Maroney was shocked and surprised about the need to go with the EFI pumping system. D'Aoust could not recall that anyone from the Water Department communicated to Maroney before the January 5, 2016 meeting that he "needed to go with the EFI skid design." (D. 104-3, pp. 138-139). Similarly, Lewis does not remember speaking with "D'Aoust in September 2014 about the need to use the EFI product."[25] (D. 104-4, ¶ 14).

Maroney acted promptly after the January 2016 meeting by engaging the EFI manufacturer's New England representative, Fred Haines ("Haines"), to prepare a proposal for an EFI system. (D. 97-2, pp. 91-92). Thereafter, as instructed by Maroney, Lewis

---

[24] Maroney testified that he and Lewis "had not done anything more to the [prior] plans because there was so little . . . left to do." (D. 97-2, p. 79).

[25] Although the defendants contend otherwise (D. 97, ¶¶ 26-27), the record is construed in the plaintiff's favor.

communicated several times with Haines and met with him on January
11, 2016.  (D. 104-4, ¶ 15) (D. 97-2, pp. 80-81).  Nevertheless,
Maroney did not "submit an EFI design to the City for review."[26]
(D. 97-2, p. 99).  He also did not advise the Planning Board at a
November 2016 Planning Board meeting "that he had a contract with
EFI."  (D. 104, ¶ 74).

In April 2016, Maroney emailed Glenn Smith ("Smith"), the
water distribution system supervisor (D. 97-4, p. 79), asking to
place data loggers on fire hydrants on Parsonage Hill Road.[27]  A
follow-up email from Maroney in May 2016 informed Smith about fire
flow tests that Maroney had scheduled in the near future.  (D. 94-
4, p. 146).  Smith forwarded the email to Ward, who then forwarded
the email to the City's attorney in the state court lawsuit.  (D.
97-4, pp. 146-147).  Drawing reasonable inferences in Maroney's
favor, the City did not allow the tests because Maroney filed a
motion to compel them in the state court lawsuit.  (D. 104, ¶ 61)
(D. 97-4, p. 148) (D. 97-18)[28] (D. 104, ¶ 61).

---

[26] He explains that he obtained his "first quote" for the design in June 2016,
and, after several requests for flow tests required for the design, Maroney
finally received them on October 23, 2016, shortly before the deadline in the
last Tri-Partite Agreement.  (D. 97-2, pp. 91, 99).

[27] In opposing summary judgment (D. 105), the plaintiff does not develop an
argument that the City's approval of building permits without requiring a water
booster station in the DelHaven Estates and the Parsonage Hill subdivisions, as
stated in the operative complaint (D. 51, ¶¶ 26-27, 56, 59), contravenes
substantive due process.  (D. 97-4, p. 135); see Dusel, 52 F.4th at 513-514.

[28] The letters (D. 97-18) are not considered for the truth of the matter asserted
but rather for purposes of showing motive.  Related to the above, Maroney argues
that Ward "balked at allowing Maroney to conduct the water tests" as one of the
roadblocks Ward created in carrying out the Mayor's threats.  (D. 105, pp. 11-

In June 2016, "Maroney submitted a site plan for the water booster station." (D. 104, ¶ 62). On July 21, 2016, he met with Ward and D'Aoust to discuss the additional information needed to approve the site plan. (D. 104, ¶ 63, sent. one) (D. 97-2, p. 109) (D. 97-4, p. 152). Ward believed there was a "holdup" because Maroney needed "a structural engineer on the foundation," which Ward described as "a requirement from the building inspector." (D. 97-4, pp. 152-153). Maroney disagreed about the site plan needing a more detailed structural plan to obtain review because it was contrary to the City's building code. (D. 97-2, pp. 109-110) (D. 104, ¶ 63, Response). A memorandum from the City's Building Inspector to Ward the next day recited the need for "[a] detailed structural plan . . . with professional design for . . . the pump equipment" and foundation.[29] (D. 97-19, p. 4). In lieu "of submitting the additional information requested for the review of the site plan, Maroney filed" this lawsuit on August 1, 2016. (D. 104, ¶ 65).

## G. Decision Not to Extend Tri-Partite Agreement

In the fall of 2016, the Planning Board held a series of meetings to address Maroney's request to extend the existing Tri-

---

12). A reasonable jury could not find that the Mayor instructed or directed Ward to carry out the Mayor's threats regarding these tests, which related to the newly-installed water main and its impact on the design of the water booster station. *See infra* note 47 and accompanying text.

[29] The memorandum is not considered for the truth of the matter asserted. Rather, the court considers it to show Ward's lack of bad faith or malice.

Partite Agreement.  At a September 14, 2016 meeting, Ward spoke out against extending the agreement and allowing more time for Maroney to complete the water booster station.  (D. 97-24, p. 5). Prior to September 2016, Ward had not attended a Planning Board meeting.  (D. 97-4, p. 154).  The Board continued the matter to the October meeting.  (D. 97-24, pp. 22-23).

At the October 12, 2016 meeting, Ward again recommended against extending the time to build the water booster station.  He also noted that Wright-Pierce's hydraulic analysis determined that the remaining lots were unserviceable in the sense that they lacked adequate water "pressure and flow under certain circumstances."[30] (D. 97-25, pp. 5-7, 20-21).  The City's engineer "defer[red] to the water department" with respect to the water booster station and otherwise recommended a one-year extension of the Tri-Partite Agreement and an accompanying increase in the bond amount.  (D. 97-25, pp. 7-8).  Maroney spoke in favor of extending the Tri-Partite Agreement.  (D. 97-25, p. 16).  In the end, the Planning Board voted to extend the time to install municipal services, "with

---

[30] The plaintiff moves to strike the following from the defendants' undisputed statement of material facts:  "Ward attended the [October 12, 2016] Planning Board meeting *on advice of Counsel* to speak against the extension of the tripartite agreement and prepared a letter recommending that the Planning Board deny any requests for the developer to extend the completion date for the water booster pumping station in September 2016."  (D. 97, ¶ 72).  The plaintiff moves to strike this paragraph because the defendants waived the attorney-client privilege.  (D. 103).  The court did not rely on this statement or the cited deposition testimony regarding advice of counsel.  Accordingly, striking or failing to credit the paragraph would not alter the court's decision on the summary judgment motion.

the exception of the water booster station," to November 1, 2017. (D. 97-25, pp. 49-52).  Relatedly, the Board required Maroney to provide a Tri-Partite Agreement with his and the bank's signatures containing the extension and a performance guarantee to the Planning Board before November 1, 2016.  (D. 97-25, pp. 50-55).

Maroney did not provide an executed Tri-Partite Agreement before November 1, 2016, or at the next Board meeting on November 15, 2016.[31]  (D. 97-26, p. 2).  After hearing from Maroney, the Board voted "to instruct special counsel to take" the necessary steps to obtain disbursement of the funds from the bank "to complete the remaining work on the Crystal Springs" development. (D. 97-26, p. 11).  Eventually, a new developer built the water booster station using an EFI pumping system after the plaintiff "lost the development."  (D. 97-2, p. 192) (D. 97-4, p. 175) (D. 104, ¶ 83).

## H.  Mayor's Interactions with Ward[32]

The Mayor appointed Ward to his position.[33]  (D. 97-4, p. 10). Ward typically met with the Mayor and the Director of the Water

---

[31] The Board's special counsel represented that Maroney submitted a draft without the bank's signature.  (D. 97-26, p. 11).

[32] The plaintiff identifies various disputed facts (D. 104, ¶¶ 79-82, Responses) to refute the defendants' arguments that Ward was not following directives from the Mayor.

[33] Relatedly, and according to the Mayor's testimony, Ward had a contract at the time although the Mayor did not know whether Ward's contract had a clause requiring "just cause" to remove Ward from his position.  The Mayor further testified that these clauses "are normally" in such contracts.  (D. 97-12, pp. 141-142).

Department on a weekly basis, including from 2014 through 2016. (D. 97-4, pp. 11, 13). During the 2014 through 2016 time-period, Ward would give the Mayor a quick update about the Crystal Springs subdivision if they had not "spoken about it in quite a while." (D. 97-4, p. 13). According to Ward, at least in or around 2012, the Mayor was interested in the timing and completion of the water booster station. (D. 97-4, pp. 26-27) (D. 104-11).

The Mayor does "not have permit-granting authority." (D. 97-12, p. 140) (D. 104-9, p. 18). He also did not get involved in the subdivision's approval process, according to his testimony. (D. 104-9, p. 18). Nevertheless, in October 2012 at the request of a City employee, the Mayor set up a meeting to see if he "could help speed along the development" and met with Maroney, Ward, and other City officials. (D. 97-12, pp. 36-37). The Mayor may also have met with Maroney, Ward, and other City officials in July 2013 to reach an agreement "about the project going forward." (D. 97-12, p. 55). The Mayor remembers "at least one discussion with [Ward] about" whether some of the lots had sufficient water pressure to meet state "or local standards and whether some of them could be released." (D. 97-12, p. 77). As indicated, Ward did not talk to the Mayor before Ward made the decision to stop approving water service applications as of March 2015. (D. 97-4, pp. 82-83).

After Maroney filed the state court lawsuit, Ward had very little communication with the Mayor about building the water booster station.  (D. 97-4, p. 132).  In December 2015, Maroney wrote an email to the City Council President stating that "the Mayor [was] bullying [him]."[34]  (D. 97-4, p. 131).  The City Council President forwarded the email to the Mayor and Ward.  (D. 97-4, p. 132).  Upon receiving the email, Ward spoke with the City Council President about the requirement in the definitive plan that Ward build the water booster station.[35]  (D. 97-4, pp. 132-133).

Ward never suggested to the Mayor that there were steps that Ward could take to try and delay the Crystal Springs project or "to exert pressure on [Maroney] to address the [state court] action," according to Ward's deposition testimony.  (D. 97-4, p. 141).  Ward also did not talk to "the mayor about the city building the [water] booster station using the funds from the bond."  (D. 97-4, pp. 170-171).  Ward further testified that he never heard the Mayor say to him or anyone else that Maroney should not get

---

[34] The plaintiff cites the above in responding to a number of the defendants' statement of material facts.  (D. 104, ¶¶ 79-82, Responses).

[35] For present purposes, the court accepts the plaintiff's representation that "a short time later an offer to mediate issued to Maroney's counsel."  (D. 104, ¶¶ 79-82, Responses).  Ward denied speaking to the Mayor about any such mediation.  (D. 97-4, p. 138).  Relatedly, Ward described the Mayor as the ultimate decision-maker for the offer to mediate.  (D. 97-4, p. 138).

any permits until he dismissed the state court lawsuit.[36]  (D. 97-4, p. 173).

## III.  <u>DISCUSSION</u>

As noted, the plaintiff asserts the following claims:  a violation of substantive due process under section 1983; a violation of MCRA; interference with contractual or economic relations; and civil conspiracy.  (D. 51).  The court addresses the claims *seriatim*.

## A.  <u>Substantive Due Process</u>

In seeking summary judgment on the substantive due process claim, the defendants first argue that the plaintiff did not suffer a cognizable property interest.  Second, they assert that neither Ward's nor the Mayor's conduct "shocks the conscience."  (D. 96, 110).

As to the first argument, the plaintiff relies on the court's prior determination under *Kennie v. Nat. Res. Dept. of Dennis*, 889 N.E.2d 936, 943 (Mass. 2008), that "Massachusetts has recognized a property interest where a plaintiff alleges that a state actor has interfered with his right to obtain permits to make improvements on his land."  (D. 77, pp. 14-15) (D. 105, pp. 13-

---

[36] The above is not a statement under Federal Rule of Evidence 801(a).  *See Mack v. St. Mobile Aerospace Eng'g, Inc.*, 195 F. App'x 829, 842 (11th Cir. 2006) ("Wayne's testimony that Gennaro did *not* tell him . . company's EEO Policy required him to report harassment . . . is not hearsay" because it is not a statement) (citing Federal Rule of Evidence 801(a)(1)) (emphasis added).

14, n.5).   In response to the second argument, the plaintiff identifies, inter alia, the following conscience-shocking conduct: Ward's post-lawsuit decision to prevent Maroney from getting permits after he refused to dismiss the state court lawsuit; the Mayor's threats to Maroney and others that he would not receive permits unless he dropped the state court lawsuit; Ward's January 2016 decision to change to the EFI pumping system even though Maroney was substantially complete with the design of the field built station and "the City knew" Maroney would not have sufficient time to build the water booster station by the November 1, 2016 deadline;[37] Ward's "balk[ing] at allowing Maroney to conduct the water tests";[38] and Ward's attendance at the October 2016 Planning Board meeting, which was the first time he attended such a meeting,[39] and his opposition to extending the time to build the water booster station.   (D. 105) (D. 104, ¶¶ 30, 57, 60-61, 70, Responses).

### 1. __Conscience-Shocking Conduct__

To succeed in establishing a substantive due process claim, the plaintiff must "prove that [he] suffered the deprivation of an

---

[37] Given the backdrop of the Tri-Partite Agreement expiring on November 1, 2016, the plaintiff points to D'Aoust's testimony that a redesign would take 59 weeks, i.e., until February or March 2017.   (D. 104-3, pp. 144-145).

[38] _See supra_ note 28.

[39] Ward did attend the September 2016 meeting, but this fact does not alter the thrust of the plaintiff's argument.

established life, liberty, or property interest, *and* that such deprivation occurred through governmental action that shocks the conscience." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (citation omitted).  The defendants' twofold argument challenges each requirement.  Assuming the existence of a cognizable property interest, the court turns to the latter requirement.

Substantive due process prevents "'abuse of government power that shocks the conscience,' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.'" *PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 31–32 (1st Cir. 1991) (citations omitted), *overruled on other grounds by San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá*, 687 F.3d 465 (1st Cir. 2012); *Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 69 (D. Mass. 2013) (quoting *PFZ*, 928 F.2d at 31–32). The First Circuit has "*repeatedly* held that the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong." *Clark*, 514 F.3d at 113 (emphasis added) (internal quotation marks omitted).   Under the applicable shocks-the-conscience test, an ordinary, "run-of-the-mill land-use case . . . does not rise to the level of behavior that shocks the conscience." *Id.*; *see Mongeau v. City of Marlborough*, 492 F.3d 14, 18 (1st Cir. 2007) (recognizing "shocks-the-conscience test

applied to a substantive due process claim in the land use context"). A land-use planning dispute, "at least when not tainted with fundamental procedural irregularity, racial animus, or the like[,] . . . does not implicate the Constitution." *Creative Env't, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982); *see Brockton*, 948 F. Supp. 2d at 69 (denying motion to dismiss and stating, in land-use context, "plaintiff must allege 'fundamental procedural irregularity, racial animus, or the like,' or violation of 'a fundamental principle'")[40] (quoting *Clark*, 514 F.3d at 113).

Whereas the First Circuit has acknowledged using "various incantations" to describe the substantive due process standard, *Mongeau*, 492 F.3d at 19; *accord Thayre v. Town of Brookline*, Civil Action No. 20-cv-10510-DJC, 2021 WL 664042, at *6 (D. Mass. Feb. 19, 2021), the standard is undeniably "a high one." *Licari v. Ferruzzi*, 22 F.3d 344, 350 (1st Cir. 1994) (citation omitted). In the context of land-use cases, the First Circuit has only "left the door *slightly* ajar for federal relief in truly *horrendous* situations." *Néstor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992) (emphasis added); *accord Licari*, 22 F.3d at 350 (citation omitted).

---

[40] The "fundamental procedural irregularity" identified in *Brockton* was an "ongoing refusal of the defendants to even consider the plaintiffs' submissions," i.e., a "systemic denial of any pre-deprivation process at all despite repeated reversals by the state courts." *Brockton*, 948 F. Supp. 2d at 69.

Circumstances that do not rise to this high level help to clarify the boundaries of the standard. For example, when state planning officials "violate[] state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation." *Mongeau*, 492 F.3d at 17 (citations omitted). "[E]ven abridgments of state law committed in bad faith do not necessarily amount to unconstitutional deprivations of due process." *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 43 (1st Cir. 1987); *accord Creative Env't,* 680 F.2d at 831-833 (affirming allowance of summary judgment on substantive due process claim against subdivision developer notwithstanding Planning Board's arbitrary misapplication of state law and "distortion" of "statutory and regulatory scheme"); *see Chiplin Enter., Inc. v. City of Lebanon*, 712 F.2d 1524, 1528 & n.6 (1st Cir. 1983) (stating, in context of substantive due process claim, "mere bad faith refusal to follow state law in such local administrative matters simply does not amount to a deprivation of due process where the state courts are available to correct the error"). Likewise, First Circuit "cases make clear that a regulatory board does not transgress constitutional due process requirements merely by making decisions 'for erroneous reasons' or by making 'demands which arguably exceed its authority under the relevant state statutes.'" *Licari*, 22 F.3d at 350 (citations omitted).

A.  **Ward**

Viewed under these boundaries, Ward's conduct and the examples of conscience-shocking conduct the plaintiff identifies fall squarely outside the realm of substantive due process violations.  For example, Ward's March and April 2015 refusals to approve more water service applications and to "sign off on additional permits" because of the lack of "work toward the water booster station" (D. 104, ¶¶ 29-30) as well as Ward's continued refusals after the July 2015 lawsuit and the Mayor's statements are not conscience shocking.  This remains true even if Ward's refusals and denials were erroneous, contrary to the definitive plan (which did not require such progress or set a deadline to complete the booster station's construction), or contrary to Maroney's October 2013 schedule to build the station after completing phase one of Front Nine Drive.  *See Martone Place, LLC v. City of Springfield*, C.A. No. 16-cv-30170-MAP, 2017 WL 5889222, at *16 (D. Mass. Nov. 29, 2017) (dismissing substantive due process claim based, inter alia, on Springfield's Department of Public Works Director who, knowing plaintiff's deadline to complete project and using authority unlawfully granted to him by another city official, imposed multiple obstacles to issuance of building permit); *see also Creative Env'ts*, 680 F.2d at 833 (affirming

rejection of substantive due process claim on summary judgment and finding no violation even if planning officials "clearly violate[d]" or "'distort[ed]' the state [subdivision] scheme under which they operate"); *accord Clark*, 514 F.3d at 113 (citing *Creative Env'ts*, 680 F.2d at 826, 833-834, as "holding that city planning board's denial of the permits required to develop a residential subdivision, allegedly premised on criteria that were arbitrary and capricious and exceeded the Planning Board's discretion, did not constitute behavior that shocked the conscience"); *Licari*, 22 F.3d at 350 (decisions made for erroneous reasons do not transgress substantive due process).

Ward's January 2016 decision to change the design of the pumping system likewise fails to support a substantive due process violation. First, *Haverhill's Subdivision Rules* require the design and construction of a pumping station to comply with the Water Department's requirements.[41]  Ward therefore had the authority to change the design.  Maroney's failure to work on completing the field-built design for the water booster station between October 2013 and January 2016 underscores the legitimate interest Ward had in changing the pumping system design.  Second, a planning official's violation of state law or administrative procedures does not typically contravene substantive due process,

---

[41] *See supra* note 14.

*see Mongeau*, 492 F.3d at 17 (citations omitted), even if committed in bad faith, s*ee Chongris*, 811 F.2d at 43.  Ward's January 2016 decision to change his prior decision to consider (or even accept) a field-built design is decidedly less horrendous and less egregious than a violation of state law committed in bad faith.[42] As such, the decision falls short of conscience-shocking conduct. Likewise, Ward's 2016 involvement in the water tests or Ward's July 2016 misinterpretation, if any, of the City's building code regarding the site plan is not conscience shocking.  *See Licari*, 22 F.3d at 350 (citations omitted); *Thayre*, 2021 WL 664042, at *7 (Defendant's alleged violation of substantive due process "by interpreting the [Zoning Bylaw] in a manner beyond the scope of its authority, thereby committing ultra vires," does not violate substantive due process.).

Ward's appearance at the October 2016 Planning Board meeting and speaking out against an extension of the Tri-Partite Agreement to allow Maroney to build the water booster station also was not conscience shocking.  At the meeting, Ward explained that the remaining Front Nine Drive lots lacked adequate water pressure as determined by Wright-Pierce's hydraulic analysis.  (D. 97-25, pp. 18-20).  Ward's expressed concern at the meeting was not baseless. As such, his conduct is not conscience shocking even if Ward had

---

[42] This court assumes, in the plaintiff's favor, that Ward knew Maroney would not be able to complete the redesign until February or March 2017, thus giving rise to the possibility that he acted in bad faith.

not attended a Planning Board meeting before the fall of 2016. *See Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 138-139 (1st Cir. 2016) (noting that Water District's Superintendent spoke out against subdivision's impact on water supply at Planning Board meeting); *id.* at 145 (concluding that Water District's Superintendent's concern that subdivision would harm town's water supply "does not . . . appear baseless" and "is hardly the . . . stuff that makes a substantive due process claim").

In all, Ward's conduct considered in its entirety does not shock the conscience.  Rather, it is similar to (or even less egregious than) the conduct at issue in *Clark*, in which dismissed a substantive due process claim under the more forgiving, plausibility standard of Federal Rule of Civil Procedure 12(b)(6). *See Clark*, 514 F.3d at 110-113.  In *Clark*, the Westfield City Water Department ("WD") denied the developers' municipal water service request for a proposed residential subdivision because it "would threaten the municipal water supply" even though the WD's own contractor determined the project "would benefit the entire city with increased water pressure and flow."  *Clark*, 514 F.3d at 110-111.  WD officials also advised the developers' engineer that they "did not intend to grant" the developers "municipal water service because 'the City did not want the project there.'"  *Id.* at 110. Like the case at bar, the officials spoke out against the project at a municipal planning board meeting.  Eventually, the City of

Westfield exercised its eminent domain powers and took a portion of the property rendering the "development plans unfeasible." *Id.* at 111.

In sum, and per the foregoing, the substantive due process claim fails against Ward on the merits. It is therefore not necessary to address his qualified immunity argument. *See Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 134 (1st Cir. 2005) (failure of "constitutional claims obviates our need to address the qualified immunity defense: we have found no constitutional violation").

### B. **The Mayor**

The Mayor argues that he made the alleged statements to drop the state court lawsuit in exchange for the permits to Maroney and others in the context of settlement discussions. He also repeatedly asserts that "the Mayor is not the permit granting authority" for the City. (D. 96). The defendants further contend that the statements had no impact on Ward's decisions to continue not approving water service applications and not signing-off on permits, Ward's change to an EFI pumping system, and Ward's attendance at the Planning Board's fall 2016 meetings. The Mayor also seeks qualified immunity. (D. 96).

The plaintiff argues that the Mayor's threats to Maroney and others that he would never receive any permits unless he dropped the state court lawsuit were conscience shocking, and that Maroney

as well as Deyermond viewed them as extortionate.   (D. 105).   The
plaintiff additionally maintains that Ward shared the Mayor's
motivation and/or acted at the Mayor's direction, as evidenced by
their weekly meetings and the Mayor's appointment of Ward to his
position.   (D. 105).   As a basis to show conscience-shocking
behavior, the plaintiff identifies the "violation of 'a
fundamental principle,'" namely, "the fundamental constitutional
principle that public officials cannot threaten" or deny benefits
because an individual uses "the courts to redress grievances," a
principle "embedded in the First Amendment."   (D. 105, pp. 13-14,
¶ III).

　　　The plaintiff's arguments are not convincing.   First,
"[s]ubstantive due process is an inappropriate avenue of relief
when the governmental conduct at issue is covered by a specific
constitutional provision," such as "the First Amendment."[43]   *Pagán
v. Calderón*, 448 F.3d 16, 33-34 (1st Cir. 2006) (citations
omitted).   Moreover, this "rule depends *only* on whether a specific
constitutional provision addresses the type of conduct at issue."
*Id.* at 34 (emphasis added).   "[I]t does not depend on a prediction
that the complaining party will be successful in pursuing a claim

---

[43] The fact that the defendants did not develop this argument "does not prevent
[the court] from ruling on this basis . . . ."   *ML-CFC 2007-6 Puerto Rico
Props., LLC v. BPP Retail Props., LLC*, 951 F.3d 41, 46 (1st Cir. 2020)
(citations omitted); *see id.* ("When an issue or claim is properly before the
court, the court is not limited to the particular legal theories advanced by
the parties, but rather retains the independent power to identify and apply the
proper construction of governing law." (quoting *Kamen v. Kemper Fin. Servs.,
Inc.*, 500 U.S. 90, 99 (1991))).

under the applicable provision, nor does it depend on a conclusion that the party has a valid claim thereunder." *Id.; accord Rodriguez-Deynes v. Moreno-Alonso*, Civ. No. 16-2986 (PG), 2019 WL 1354030, at *9 (D.P.R. Mar. 2, 2019) ("[S]uccess or failure of plaintiff's First Amendment retaliation claim is immaterial to the inapplicability of a substantive due process claim.").[44]

Second, the defendants' settlement argument, at least with respect to the September 2015 meeting between the Mayor and Maroney, is well taken. *See Raskiewicz v. Town of New Boston*, 754 F.2d 38, 41 (1st Cir. 1985) (upholding decision by Board of Selectmen, which had the authority to issue gravel permit, to condition permit on dismissal of developer's state court lawsuit). In *Raskewicz*, the condition placed on the gravel permit to dismiss the lawsuit arose after the state court continued a hearing and ordered the plaintiff to submit a proposal to the defendants for the gravel removal operation and further ordered the defendants to respond with any concerns or conditions. *Id.* The defendants responded with the condition. *Id.* Viewing the circumstances as settlement-related, the First Circuit found "no impropriety in the one condition that Raskiewicz contend[ed] made the permit unacceptable, the requirement that he drop his state court suit,

---

[44] In that regard, the denial of amendment to add a First Amendment retaliation claim for separate reasons has no bearing on the viability of the substantive due process claim. Furthermore, it does not warrant allowing the substantive due process to proceed.

because as the district court noted, '[e]ven the shabbiest of lawyering practice requires that in settling a suit you bargain to have any pending actions dropped.'"[45]  *Id.* at 45 n.6 (quoting district court's decision).  Relatedly, one of the Selectman in *Raskiewicz* stated to the plaintiff and separately to another individual that the plaintiff "would never be given a gravel permit."  *Id.* at 40 & n.1.

Here, the Mayor's September 2015 meeting with Maroney similarly concerned the settlement of the state court action.  No reasonable juror could conclude otherwise.  The Mayor asked Maroney why he had not brought his attorney and the two discussed how "to resolve this problem."  (D. 104, ¶ 47).  During the meeting, the Mayor indicated that Maroney owed the City $250,000 for illegally building the houses without permits, Maroney disagreed, and the Mayor stated to Maroney that he could dismiss the lawsuit, have all the permits he wanted, and "we'll make the fines go away." (D. 97-2, p. 123).  As was the case in *Raskiewicz*, the Mayor's threat or extortion-like statement to drop the lawsuit to receive

---

[45] To add a caveat, it is unclear whether the section 1983 due process claim in *Raskiewicz*, which primarily involved allegations that the Board of Selectman was biased but also concerned the imposition of the condition, was a procedural and/or substantive due process claim.  The decision does not distinguish between procedural and substantive due process.  Rather, it refers to a "due process claim."  *Id.* at 44-45.  Nevertheless, the court's finding "no impropriety in the" condition on the permit to drop the lawsuit was not addressing the adequacy of administrative remedies, which would be suggestive of a procedural due process claim or the bias of the decisionmakers, *see id.* at 44-45.  In any event, the court's finding "no impropriety" and, thus, no due process violation, concerning conduct analogous to the case at bar serves as clearly established law to warrant qualified immunity for the Mayor, as discussed below.

the permits amounted to bargaining with Maroney to have him dismiss the lawsuit.  The Mayor's expressed desire "to go to meditation" at a meeting two days later along with Maroney emailing the proposed agreement thereafter reinforces the settlement construct. (D. 104, ¶¶ 49, 51).

The Mayor's two other purported threats to allegedly extort Maroney to drop the lawsuit occurred shortly after Maroney filed the state court lawsuit and before he met with the Mayor.  Here, a reasonable jury could consider these statements as arising outside the settlement context.  Nevertheless, the First Circuit has only *suggested* the possibility that bribing or threatening the permitting authority "could constitute a substantive due process violation."  *Mongeau*, 492 F.3d at 19-20 ("In *Néstor Colón*, we suggested that it was possible that bribery or threats could constitute a substantive due process violation."); *Néstor*, 964 F.2d at 47 (facts did not indicate Puerto Rico Planning Board "officials were bribed or threatened" and declining to consider "in what circumstances such conduct might violate due process");[46] *Collier v. Town of Harvard*, No. Civ. A. 95-11652-DPW, 1997 WL 33781338, at *5 (D. Mass. Mar. 28, 1997) (finding this language in *Néstor* "suggests the First Circuit would be willing to permit,

---

[46] The permitting authority in *Néstor* was the Puerto Rico Planning Board ("PRPB").

under certain circumstances, land-use-related substantive due process claims to go forward").

In addition, the suggestion in *Néstor* that threats could constitute a violation of substantive due process pertained to threats against "PRPB officials." *Néstor*, 964 F.2d at 47. Unlike the PRPB officials, the Mayor was not a member of the Planning Board, and he did not have permit-granting authority. Rather, Ward had the authority to approve or deny water service applications and the redesigned EFI water pump system.[47]

It is true that the Mayor met with Ward on a weekly basis between 2014 and 2016. It is also true that the Mayor was interested in the completion of the water booster station, and he appointed Ward to his position. The subject of meetings during the 2014 to 2016 time-period, however, did not revolve around Crystal Springs. Rather, as previously noted, when Ward and the Mayor had not spoken about the development "in quite a while," Ward would merely provide a "quick update." (D. 97-4, p. 13). Similarly, "if there was something going on or something different happening" at the development, Ward would provide "a brief update." (D. 97-4, p. 13). Further, Ward did not speak with the Mayor before the March 2015 decision to not approve more water service applications. Tellingly, after the lawsuit's filing and the

---

[47] See *supra* note 14.

Mayor's August statements, Ward acted consistently with his prior conduct.  Based on the entire record, including the December 2015 email that led to the mediation offer as well as the water tests and *all* the other evidence the plaintiff identifies, a reasonable juror could not find that Ward was following the Mayor's directives in changing to the EFI design in January 2016 and opposing the extension of time to build the water booster station during the September and October Planning Board meetings.[48]

Third, viewed against the high standard for "federal relief in truly horrendous situations," *Néstor,* 964 F.2d at 45, a reasonable jury could only conclude that the Mayor's conduct falls short of the conscience-shocking standard.  In sum, and per the foregoing, the substantive due process claim against the Mayor is subject to summary judgment on the merits.  Although the analysis could end here, the court addresses the Mayor's qualified immunity in the interest of thoroughness.

## 2.  **Qualified Immunity**

The defendants argue that the Mayor is entitled to qualified immunity because of the absence of a violation of a constitutional right and because any such constitutional right was not clearly

---

[48] Separately, the same reasoning and facts, along with the record as a whole, foreclose a genuinely disputed fact that Ward:  (1) gave substantial assistance to the Mayor with respect to the civil conspiracy claim; and/or (2) acted in concert with or pursuant to a common design or an agreement with the Mayor as to this claim.

established.  (D. 96, pp. 13-16).  In addressing qualified immunity

on the Mayor's substantive due process claim, the plaintiff's brief

argument reads as follows:

> [T]he substantive due process law regarding "shocking the
> conscience" and prohibiting particularly "offensive
> actions" was established in this Circuit well before the
> conduct occurred here.  Attempts to interfere with
> First Amendment rights such as occurred here, are
> prohibited and offensive, also barring qualified immunity
> from applying to the claim under Count I.

(D. 105, p. 16).

The qualified immunity doctrine "shields officers from civil

liability so long as their conduct 'does not violate clearly

established statutory or constitutional rights of which a

reasonable person would have known.'"  *City of Tahlequah v. Bond*,

142 S. Ct. 9, 11 (2021).  Under a "two-prong framework, courts ask

(1) whether the defendant violated the plaintiff's constitutional

rights and (2) whether the right at issue was 'clearly established'

at the time of the alleged violation."  *Swartz v. Sylvester*, 53

F.4th 693, 698 (1st Cir. 2022) (citation omitted).  Either prong

may entitle an official to qualified immunity.  *Id.* (citation and

internal brackets omitted).  Here, the court relies on the second

prong.

"Clearly established means that, at the time of" the conduct

at issue, "the law was sufficiently clear that *every* reasonable

official would understand that what he is doing is unlawful."

*Castagna v. Jean*, 2 F.4th 9, 10 (1st Cir. 2021) (quoting *District*

*of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)) (emphasis added); *accord French v. Merrill*, 15 F.4th 116, 126 (1st Cir. 2021) (quoting *Wesby*, 138 S. Ct. at 589).  Although "a case directly on point" is not required, the "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam).

The clearly established prong has two subparts. *See Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017).  First, "the plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm.'" *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (citation omitted); *Alfano*, 847 F.3d at 75 ("[F]irst sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm.") (citations omitted); *accord Punsky v. City of Portland*, 54 F.4th 62, 66 (1st Cir. 2022) (Under first subpart, "a 'clearly established' right is one that is 'sufficiently clear' such that 'every reasonable official would have understood that what he is doing violates that right.'") (citations omitted); *Justiniano v. Walker*, 986 F.3d 11, 26 (1st Cir. 2021) (framing first subpart as "'whether the right was clearly established at the time of the alleged violation'")

44

(citations omitted).  The plaintiff fails under the first subpart
because he does identify controlling authority or a consensus of
persuasive authority that would send a clear signal to a reasonable
official that certain conduct violates the substantive due process
constitutional norm.

Second, the plaintiff must "show that an objectively
reasonable officer would have known that his conduct violated the
law." *Est. of Rahim by Rahim*, 51 F.4th at 410 (citation omitted);
*accord Justiniano*, 986 F.3d at 26 (depicting second subpart as
"'whether a reasonable officer, similarly situated, would
understand that the challenged conduct violated that established
right'").  The plaintiff's burden to show "that the law is clearly
established" is "a heavy" one.  *Est. of Rahim by Rahim*, 51 F.4th
at 410 (citation omitted).

Notably, "[t]o be clearly established, a legal principle must
have a sufficiently clear foundation in then-existing precedent."
*Wesby*, 138 S.Ct. at 589-90.  "The rule must be 'settled law,'
which, as indicated above, "means it is dictated by 'controlling
authority' or 'a robust "consensus of cases of persuasive
authority."'"  *Id.* (citations omitted).  Significantly, "[i]t is
not enough that a rule be *suggested* by then-existing precedent;
the rule's contours must be so well defined that it is 'clear to
a reasonable officer that his conduct was unlawful in the situation
he confronted.'"  *City of Tahlequah*, 142 S.Ct. at 9 (quoting *Wesby*,

138 S.Ct. at 590) (emphasis added).  Here, as previously explained, precedent in this circuit involving land-use substantive due process claims, namely, *Néstor*, 964 F.2d at 47, only "*suggested that it was possible that bribery or threats could constitute a substantive due process violation.*"  *Mongeau*, 492 F.3d at 19-20 (addressing *Néstor*, 964 F.2d at 47) (emphasis added); *see Néstor*, 964 F.2d at 47 (declining to consider "[w]hether and in what circumstances" conduct involving bribes or threats "by the political leaders" against PRPB officials "might violate due process" because record merely indicated "politicians participated in demonstrations . . . and wrote letters" opposing project). Coupled with the precedent in *Raskiewicz*, 754 F.2d at 41, 45 & n.6, which affirmed summary judgment on the due process challenge to the gravel permit conditioned on dismissing the state court lawsuit against the backdrop of settlement negotiations, it would not be clear to a reasonable official in the Mayor's shoes "'that his conduct was unlawful . . . .'"  *City of Tahlequah*, 142 S. Ct. at 11 (quoting *Wesby*, 138 S. Ct. at 590); *see Justiniano*, 986 F.3d at 26 (contours of clearly established right should be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it") (citation omitted).  Specifically, it would not be clear to a reasonable official that his conduct violated a clearly established substantive due process rule in stating that Maroney

needed to drop the lawsuit to get the requested permits.  Likewise, assuming *dubitante* the Mayor somehow directed or even materially influenced Ward to change the pumping system design or oppose the extension of the Tri-Partite Agreement in 2016, it would not be clear to a reasonable official, similarly situated, that his conduct engaging in the same violated a clearly established substantive due process right.

Per the foregoing, the Mayor is also entitled to qualified immunity.  Summary judgment on the substantive due process claim therefore is appropriate.[49]

---

[49] The dismissal of the anchoring federal claim raises the issue of whether to retain jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3).  "Federal courts may retain jurisdiction in appropriate cases but, before doing so, must consider 'the interests of fairness, judicial economy, convenience, and comity,' the last of which is 'a particularly important concern in these cases.'"  *Lambert v. Fiorentini*, 949 F.3d 22, 29 (1st Cir. 2020) (citation omitted).  "[I]n the usual case," the balance of these factors "will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) (citation omitted).  The MCRA and section 1983 claims, however, are coextensive, as discussed below, and raise overlapping issues of substantive due process.  Hence, the MCRA claim does not present "substantial question[s] of state law."  *Id.* (finding no abuse of discretion in district court exercising supplemental jurisdiction over MCRA claim after dismissal of section 1983 claim).  Fairness as well as judicial economy and convenience also warrant retaining jurisdiction over the remaining state law claims.  First, the court's disposition of the remaining state law claims "will materially shorten the time it will take to resolve the parties' dispute."  *Desjardins v. Willard*, 777 F.3d 43, 45 (1st Cir. 2015) (citing *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998)).  The court is familiar with the facts and issues in this case, having previously issued two opinions (D. 52, 77), and the parties have a firm trial date in one month.  Second, the claims do not raise novel, complex, or "knotty and unresolved question[s] of state law."  *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 20 (1st Cir. 2018).  Third, the case is not in its early stages, which would counsel in favor of dismissal.  *See Lambert*, 949 F.3d at 29.  Rather, it is more than six years old with a trial scheduled in June.  The balance of factors therefore weighs in favor of retaining supplemental jurisdiction over the three  state law claims.

**B.  MCRA Claim**

"To state a claim under the MCRA, a plaintiff must show that (1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." *Koppel v. Moses*, No. 20-cv-11479-LTS, 2022 WL 1272215, at *2 (D. Mass. Feb. 14, 2022) (quoting *Amirault v. City of Malden*, 241 F. Supp. 3d 288, 304 (D. Mass. 2017)).  In seeking summary judgment on the MCRA claim, the defendants argue that "'the MCRA and [section] 1983 operate co-extensively' with respect to due process guarantees," and the MCRA claim therefore "fails for the same reason" the section 1983 substantive due process claim fails.  (D. 96, p. 16).

The plaintiff argues that economic coercion provides a basis to impose liability against the Mayor.  (D. 105, pp. 16-17).  Pointing out that the Mayor denied making the threats, the plaintiff argues that that the factual dispute warrants denying summary judgment on the MCRA claim.  (D. 105, pp. 5-6, 16-17).

"Central to proof of a violation of [the MCRA] is the existence of a right secured by 'the Constitution or laws of either the United States or of the Commonwealth.'"  *K. Hovnanian at*

48

*Taunton, Inc. v. City of Taunton*, 642 N.E.2d 1044, 1048 (Mass. App. Ct. 1994) (quoting *Bally v. Ne. Univ.*, 532 N.E.2d 49, 51 (Mass. 1989)).  A "plaintiffs' right to use and enjoy their property is constitutionally secured" by "the Fourteenth Amendment to the United States Constitution."  *Kennie*, 889 N.E.2d at 941. In the case at bar, both the section 1983 substantive due process and the MCRA claims allege that the defendants deprived Maroney of the right "to own and develop [his] property," which is secured by the United States Constitution.  (D. 51, ¶¶ 57-58, 68-69).

The defendants' argument that the MCRA due process claim is coextensive with the section 1983 due process claim is well taken. "The MCRA is the state 'counterpart' to Section 1983 and, in general, is coextensive therewith."[50]  *Bruce v. Worcester Reg'l Transit Auth.*, CIV. ACT. NO. 18-40037-TSH, 2023 WL 1822786, at *7 (D. Mass. Feb. 8, 2023).  Regardless of the two differences between the statutes, under both the MCRA and section 1983, a plaintiff "must demonstrate that [the defendants] 'caused [the plaintiff] to be deprived of his constitutional rights.'"  *Morgan v. Town of Lexington*, 138 F. Supp. 3d 82, 91 (D. Mass. 2015).  Here, because the court concludes the plaintiff was not denied substantive due process on the merits under section 1983, as previously discussed,

---

[50] The "two primary differences" between the statutes is that under the MCRA "(1) the offensive conduct need not be attributable to a state actor; and (2) to succeed on [a] MCRA claim, a plaintiff must also show that the violation of rights occurred 'by threats, intimidation or coercion.'"  *Bruce*, 2023 WL 1822786, at *7 (quoting *Bally*, 532 N.E.2d at 52) (additional citation omitted).

the defendants are entitled to summary judgment on the MCRA claim as well. *See id.* ("Because the Court concludes that [the plaintiff] was not denied substantive due process [under section 1983], discussed above, the Defendants are entitled to summary judgment on [the MCRA claim] as well."); *accord Stuart v. City of Gloucester*, Civil Action No. 18-cv-11877-ADB, 2019 WL 3082830, at *11 (D. Mass. July 15, 2019) (noting MCRA "is 'basically coextensive with [section 1983],'" albeit "with some differences in . . . required elements," and dismissing MCRA due process claim, among other MCRA claims, for "same reasons" articulated "concerning the Section 1983 claim") (citation omitted); *see also Mondol v. City of Somerville*, Civil Action No. 15-cv-13697-ADB, 2017 WL 4845019, at *11 (D. Mass. Oct. 26, 2017) ("[W]here constitutional violations alleged under § 1983 fail, an MCRA claim predicated on those same alleged violations must also fail").[51] The defendants therefore are entitled to summary judgment on the MCRA claim.

## C.  <u>Interference with Contractual or Economic Relations Claim</u>

An "[i]ntentional interference with contractual or business relations" claim requires the plaintiff to "show (1) the existence of a contract or a business relationship which contemplated

---

[51] The court discerns no difference between the right to substantive due process under federal and state law in the area of land-use regulation that is material to the section 1983 versus the MCRA due process claims in this case.  In any event, the plaintiff does not argue that differences exist and therefore waives the issue.  *See Dusel*, 52 F.4th at 513-514.

economic benefit; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages." *Swanset Dev. Corp. v. City of Taunton*, 668 N.E.2d 333, 338 (Mass. 1996). With respect to the third element, the operative complaint alleges that the defendants interfered with Maroney's business dealings through improper means by depriving him of the right to develop his property "free from threats, intimidation and coercion." (D. 51, ¶ 74).

The defendants argue there is no evidence "that either Ward or the Mayor used threats, intimidation or coercion." More fundamentally, though, they argue they are entitled to summary judgment because a public official is entitled to common-law immunity when he exercises discretion, acts in good faith, without malice, and without corruption. (D. 96). In relation to the this latter argument, the defendants submit that Ward and the Mayor did not interfere with Maroney "developing his property in bad faith or with malice." (D. 96).

The plaintiff argues in opposition that a reasonable jury could infer that Ward and the Mayor acted in bad faith or with malice. Specifically, they retaliated against the plaintiff for challenging their interpretations of the subdivision plan and for

exercising his First Amendment rights by filing the state court lawsuit, according to the plaintiff.  (D. 105).

The law regarding common-law immunity is well settled.  A public official, such as Ward or the Mayor, is immune from liability when acting within his discretion as a public official and in good faith.  *Summers v. City of Fitchburg*, Case No: 15-cv-13358-DJC, 2016 WL 4926415, at *5 (D. Mass. Sept. 15, 2016) (citing *Najas*, 821 F.3d at 145-146); *Nelson v. Salem State Coll.*, 845 N.E.2d 338, 349 (Mass. 2006) (immunity shields liability when "conduct was within their discretion as public officials, and they were acting in good faith").  Specifically, under "Massachusetts common law, 'a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption.'"  *Najas*, 821 F.3d at 146 (quoting *Nelson*, 845 N.E.2d at 348); *South Boston Betterment Trust Corp. v. Boston Redevelopment Auth.*, 777 N.E.2d 812, 820 (Mass. 2002) ("public official like the mayor would not have been liable 'for negligence or other error in the making of [an official] decision' if the official acted "in good faith, without malice and without corruption.").  Furthermore, there is a "presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare."  *Najas*, 821 F.3d at 146 (citation omitted).

Immunity therefore applies when an official makes "discretionary decisions within the scope of" his official duties and acts in good faith. *Nelson*, 845 N.E.2d at 349. Conversely, when an official acts "in bad faith or with malice," he lacks such immunity. *Id.*; *accord Najas*, 821 F.3d at 146 (dismissing tortious business interference claim against Water District's Superintendent because complaint failed to plausibly show "bad faith or malice, as opposed to a concern for the Town's residents' general welfare, motivated [Superintendent's] behavior"); *see Bache v. Town of Boxborough*, Civil Action No. 21-11187-FDS, 2022 WL 392819, at *5 (D. Mass. Feb. 9, 2022), *aff'd*, 2022 WL 16551384 (1st Cir. Oct. 31, 2022) (dismissing claim because no allegations "Gath acted outside of his official capacity" as police officer enforcing court order or "in bad faith or with malice").

## 1. **Ward**

Ward's conduct parallels the conduct of the Water District Superintendent ("Superintendent") in *Najas*. *See Najas*, 821 F.3d at 145-146. The First Circuit in *Najas* found that no bad faith or malice motivated the Superintendent's behavior, which included attending Planning Board meetings and voicing opposition to the project based on the "project's impact on the public water supply." *Id.* at 137-139, 145-146. Similarly, Ward's attendance and opposition to Crystal Springs at Planning Board meetings in the

fall of 2016 does not evidence sufficient bad faith or malice to avoid summary judgment.

Further, against the backdrop of the delays in designing the pumping system, the failure to submit a final field-built design, and the increased elevations of the Front Nine Drive lots, Ward acted within his discretion as the deputy director of the Water Department in refusing to approve additional water service applications or sign off on additional permits after March and April 2015. Throughout, Ward's concern about adequate water pressure and having Maroney work toward completing the water booster station to secure adequate water pressure was by and large constant. *See Najas*, 821 F.3d at 142 (finding Superintendent's concern that project would contaminate water supply genuinely held and that "he continually voiced the same worry"); *Swanset*, 668 N.E.2d at 339 (noting "council members, acting individually, would likely have immunity" regarding interference with contractual or business relations claims "because, in considering the permit applications, they were making discretionary decisions within the scope of their official duties"). Here, no reasonable jury could find that Ward acted in bad faith and with malice.

It was also within Ward's discretion and official duties to change the design of the pumping station in January 2016. *See Haverhill Subdivision Rules*, § V.5.2.5 ("Pumping stations shall be *designed* and *constructed* in accordance with the Water Department's

requirements.") (emphasis added); (D. 97-3) (setting out City's requirements for "design and construction of water boosting pumping stations" and stating "Water Department will notify applicant of the requirements for providing adequate water service, as defined by the City and discussed herewithin").  Here again, the presumption of honesty of Ward's motives in actions ostensibly taken for the general welfare of Crystal Springs residents, particularly those in the higher elevated Front Nine Drive lots, applies.  For reasons stated previously, a reasonable jury could not find that Ward was following a directive from the Mayor.

In sum, the presumption that Ward's motives and concerns for the water supply and pressure were honest and sufficient applies. The actions about which Maroney complains were within Ward's discretion as a public official.  A reasonable jury could not infer that Ward acted in bad faith or with malice.  Accordingly, Ward is shielded from liability under common-law immunity.  *See Nelson*, 845 N.E.2d at 349 (Because officials "acted in good faith, engaging in activity that was within their discretion, they are shielded from liability by . . . common-law immunity.").

2. **The Mayor**

The Mayor's immunity, if any, arises in the factual context of the statements he made shortly after Maroney filed the state

court lawsuit, and turns upon whether a reasonable jury could find the Mayor acted in bad faith or with malice.  *See id.*

Bad faith is more than "simply bad judgment."  *Spiegel v. Beacon Participations*, 8 N.E.2d 895, 907 (Mass. 1937).  Rather, it engenders a conscience sense of wrongdoing and "means a breach of a known duty through some motive of interest or ill will."  *Id.; accord Brothers v. Town of Millbury*, Civil Action No. 14-10122-TSH, 2014 WL 4102436, at *11 (D. Mass. Aug. 14, 2014) (quoting *Spiegel*, 8 N.E.2d at 907).  Malice "means a wrongful act, done intentionally, without just cause or excuse."  *Brothers*, 2014 WL 4102436, at *11 (citation omitted); *accord Nasir v. Town of Foxborough*, Case No. 19-cv-11196-DJC, 2020 WL 1027780, at *9 (D. Mass. Mar. 3, 2020); s*ee also Cachopa v. Town of Stoughton*, 893 N.E.2d 407, 414 (Mass. App. Ct. 2008) (noting that showing public official "acted with actual malice would . . . defeat" official's immunity); *see generally Rose v. Dennehy*, Civil Action No. 08-10050-NMG, 2010 WL 3703229, at *9-10 (D. Mass. Sept. 15, 2010) (finding evidence to infer corrections "officers acted in bad faith or with malice" by assaulting and battering inmate "without justification").

In *Brothers*, a defendant police officer ("the defendant officer") acted in retaliation against another police officer ("the complainant").  *Brothers*, 2014 WL 4102436, at *11. Specifically, years earlier, the complainant took a graduate

course taught by the defendant officer and complained to school officials about the manner in which he conducted the class.  *Id.* at *1.  In retaliation for complaining to school officials, the defendant officer began investigating the complainant.  *See id.* at *1, 11 (finding allegations defendant officer was "fueled by personal animosity and retaliatory motives" plausible).  During the "hasty investigation," the defendant officer destroyed records of purportedly exonerating interviews.  *Id.*  In addition to other conduct, the court rejected common law immunity for the defendant officer regarding state law claims, including an interference with advantageous relations claim.  *Id.* at *12.

Here, a reasonable jury could infer that the Mayor acted in retaliation for the plaintiff filing the state court action without justification in attempting to intimidate Maroney to drop the lawsuit to obtain the permits to develop the remaining lots.[52]  To be sure, a jury could also infer the Mayor acted in a benign manner in attempting to settle the dispute, which falls within his discretion and his duties in deciding whether to mediate disputes.

---

[52]  The retaliatory response at issue in *Najas* involved imposing costly design and construction requirements and opposing the project with purportedly baseless statements about the project increasing nitrate levels in the Town's water supply.  *Najas*, 821 F.3d at 142 & n.10.  The court found that concern for the Town's residents, rather than bad faith or malice, motivated the Water Department's Superintendent's behavior.  *Id.* at 146. As such, the circumstances in *Najas* are factually distinct from the Mayor's comments to drop the lawsuit to get the permits in retaliation for filing the lawsuit weeks earlier.  Here, the Mayor, faced with Crystal Springs residents and prospective residents concerned about the work stoppage, proceeded to condition any progress on Maroney dropping the lawsuit.

(D. 97-4, p. 138).  Viewing the record in the plaintiff's favor, however, genuinely disputed facts preclude the Mayor's entitlement to common-law immunity on summary judgment.

Per the foregoing, summary judgment is not warranted on the interference with contractual or economic relations claim against the Mayor.   Conversely, summary judgment on the claim is appropriate for Ward.

**D.  Civil Conspiracy**

Massachusetts recognizes a vicarious liability form of civil conspiracy deriving "from 'concerted action,' whereby liability is imposed on one individual for the tort of another."   *Kurker v. Hill*, 689 N.E.2d 833, 836 (Mass. App. Ct. 1998); *accord Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir. 2018) (citing *Kurker*, 689 N.E.2d at 836).   Liability requires "an underlying tort and the conspiracy consists of" either "agreeing to, or assisting in, the underlying tort."   *Thomas*, 909 F.3d at 490 (quoting *Taylor*, 576 F.3d at 35) (emphasis added and internal brackets omitted). Regarding the conspiracy, Massachusetts recognizes "two theories of liability" under the *Restatement (Second) of Torts* § 876 (1979): "concert of action" and "substantial assistance."   *Taylor*, 576 F.3d at 35 (citations omitted).

In seeking summary judgment, the defendants argue that Ward and the Mayor did not act in concert with each other to further a common design or agreement and did not have a conspiratorial

agreement.  (D. 96, p. 19).  Further, in the context of addressing
the operative complaint's substantial assistance theory of
conspiracy (D. 51, ¶¶ 81-82), the defendants submit that Ward did
not know about the Mayor's statements and the Mayor never directed
Ward not to issue permits until Maroney dismissed the lawsuit.[53]
(D. 96, p. 18).  The defendants also argue that Ward's decision to
continue to withhold permits had nothing to do with any statements
the Mayor made.  (D. 96) (D. 110).

The plaintiff argues there is ample evidence from which to
infer that Ward and the Mayor worked together on a common plan to
deny Maroney permits and that Ward carried out the plan "by
refusing to issue permits."  (D. 105, pp. 19-20) (D. 51, ¶¶ 81-
82).  The defendants also discussed "potential strategies for
getting Maroney to drop his lawsuit," according to the plaintiff.
(D. 105, p. 20).  As an example of another joint effort which thus
infers the foregoing joint efforts to effectuate the common plan,

---

[53] Although not crystal clear, the plaintiff appears to maintain that the
defendants do not address the substantial assistance theory.  (D. 105, pp. 19-
20).  To the contrary, the defendants quote the operative complaint's
substantial assistance language (D. 51, ¶¶ 81-82), which parallels the
substantial assistance language in *Kurker*, 689 N.E.2d at 837 ("Key to this cause
of action is a defendant's substantial assistance, with the knowledge that such
assistance is contributing to a common tortious plan," including "tak[ing]
affirmative steps to . . . achievement of the result.").  (D. 96, p. 18).  The
fact that the defendants set out this paragraph under the heading of a
"Conspiracy Claim Under 42 U.S.C. §§ 1985 and 1986" does not mean they do not
make the argument regarding the only conspiracy claim pled in the operative
complaint, namely, one under state common law.  As stated in a 2017 Memorandum
and Order, the predecessor complaint (D. 27, ¶¶ 81-82) removed the references
to sections 1985 and 1986 in the original complaint (D. 1, ¶¶ 81-82) and raises
only a common law conspiracy claim.  (D. 52, p. 26).  The conspiracy claims in
the operative complaint and the predecessor complaints are identical.  (D. 27,
¶¶ 81-82) (D. 51, ¶¶ 81-82).

the plaintiff identifies Maroney's December 2015 email to the City Council stating that the Mayor was bullying him, which led to the mediation offer a short time thereafter.  (D. 105).  The plaintiff reasons "that the Mayor must have decided to offer" mediation because he is the decision-maker in this regard (D. 97-4, p. 138) and Ward must have "simply carried out that direction."  (D. 105, p. 20).

To establish "a 'concerted action' conspiracy, a plaintiff must show that defendants either (1) acted 'in concert with or pursuant to a common design with' the tortfeasor or (2) 'gave substantial assistance to' the tortfeasor's conduct." *Thomas*, 909 F.3d at 490 (citing *Kyte v. Philip Morris Inc.*, 556 N.E.2d 1025, 1027 (Mass. 1990)) (additional citation omitted).  The "'common design' theory" requires the plaintiff to "show 'first, a common design or an agreement . . . between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.'"  *Id.* (citation omitted).  The agreement need not be express, and a jury may properly draw "[a]n inference of an implied agreement . . . from the conduct of two or more parties." *Id.* (quoting *Kyte*, 556 N.E.2d at 1027).

Here, the evidence identified by the plaintiff, as the summary judgment target, is deficient as to both the Mayor and Ward. Whether viewing the underlying tortious act as either to wrongfully deny Maroney permits or to have Maroney drop the lawsuit seeking

to redress his grievances with the City, *see generally id.* at 490,
492 n.13 (common design requires underlying wrongful act which,
although not explicitly identified, "only plausible candidate" was
Thomas' wrongful termination), the result is the same.  With
respect to both, the previously discussed reasoning which defeats
that Ward was following the Mayor's directives similarly
forecloses a finding that Ward acted in concert with the Mayor.[54]
Further, no reasonable jury could find that Ward acted pursuant to
a common design with the Mayor to deny permits in general or to
deny permits unless and until Maroney dismissed the lawsuit.  In
that vein, a reasonable jury could not infer an implied agreement
between Ward and the Mayor to deny permits in general or to deny
permits unless Maroney dismissed the lawsuit.  *See id.* at 490-491
(affirming allowance of summary judgment on civil conspiracy claim
and explaining common design theory fails to infer agreement to
terminate Thomas' employment and general awareness of
investigation's progress leading to termination was insufficient).
With Ward not acting in concert with the Mayor or pursuant to a
common design or agreement with the Mayor, the common design theory
is not a viable avenue of relief.

Turning to substantial assistance in the underlying tort,
liability focuses on whether Ward rendered substantial assistance

---

[54] *See supra* note 48 and accompanying text.

to the Mayor.   To succeed under this theory, Ward "must give 'substantial assistance or encouragement' to a party engaging in tortious conduct," namely, the Mayor.  *Taylor*, 576 F.3d at 35  "Key to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan."  *Kurker*, 689 N.E.2d at 837.   The theory applies "where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." *Id.* (citations omitted).

In that vein, the record evidences that Ward had very little contact with the Mayor after Maroney filed the state court lawsuit. (D. 97-4, p. 132).  Ward also denies that the Mayor ever suggested or told him to take steps to pressure Maroney to resolve the state court lawsuit.  (D. 97-4, p. 141).  The contacts or connections the plaintiff identifies[55] do not allow a jury to reasonably infer that Ward rendered assistance, let alone substantial assistance, to the Mayor to deny permits in general or to deny permits unless Maroney dismissed the lawsuit.  Ward's conduct remained largely consistent in requiring Maroney to progress in building the water booster station, especially for the higher elevated lots.  After Maroney filed the July 2015 lawsuit, Ward continued not approving water service applications.  He also continued not signing-off on

---

[55] See *supra* note 48 and accompanying text.

any site plan applications, which would have allowed Maroney to obtain building permits and proceed with construction.  (D. 97-4, pp. 117-118) (D. 104, ¶¶ 30-31, 86).  In all, Ward's conduct showed little, if any, alteration before and after the lawsuit and the Mayor's statements.  Viewed against this backdrop, a reasonable jury could not find substantial assistance.

In short, the civil conspiracy claim therefore fails to survive summary judgment.

IV.  **CONCLUSION**

In accordance with the foregoing discussion, the summary judgment motion (D. 95) is **ALLOWED** in part and **DENIED** in part.  In particular, the motion is allowed as to Ward for all claims and allowed as to the Mayor except for the interference with contractual or economic relations claim, which is denied.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  May 18, 2023