UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL J. MARONEY, as Trustee of Premiere Realty Trust, and MARONEY CONSTRUCTION COMPANY, INC., Plaintiffs, <br><br> v. <br><br> JAMES J. FIORENTINI, Individually and in his Capacity as Mayor of the City of Haverhill, ROBERT E. WARD, Individually and in his Capacity as Deputy Director of Public Works of the City of Haverhill, Water/Wastewater Division, and THE CITY OF HAVERHILL, Defendants. | No. 16-CV-11575-DLC |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**

CABELL, Chief U.S.M.J.

This case arises from efforts by Michael J. Maroney ("Maroney") to develop a subdivision of homes in the City of Haverhill ("the City"). Having been denied certain permits, Maroney brought this action through his business entities against the City and two City officials for violations of 42 U.S.C. § 1983

("section 1983") and Massachusetts state law.[1]  The case proceeded to trial and, as some claims had been resolved through prior litigation, the claims tried to the jury consisted of a tortious interference with contractual relations claim ("contractual interference claim") and a tortious interference with business relationship claim ("business relationship claim"), both against defendant James E. Fiorentini, the City's mayor ("the Mayor").[2] (D. 179, pp. 6-7).  The contract(s) potentially at issue included an agreement between Maroney, the City, and a bank lender known as the Tri-Partite Agreement, and multiple purchase and sale agreements Maroney had signed or was hoping to sign with prospective buyers.

After hearing seven days of testimony, the jury rendered a verdict in favor of Maroney in the amount of $928,775 on the contractual interference claim and in favor of the Mayor on the business relationship claim.  The Mayor moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) ("Rule 50(b)") or, in the alternative, for a new trial under Federal Rule of Civil Procedure 59(a) ("Rule 59(a)") on the contractual

---

[1] Maroney filed suit as Trustee of Premiere Realty Trust ("Premiere"), and in the name of his company, Maroney Construction Company, Inc. ("Maroney Construction").  For ease of reference, the court uses "Maroney" in the singular form to refer to these entities.  Premiere owned the property and Maroney Construction was the general contractor for the project.  (D. 201, p. 20) (D. 243, p. 11).

[2] Prior to trial, the court allowed summary judgment on the remaining claims against the defendant Robert E. Ward ("Ward"), deputy director of the City's Department of Public Works ("the Water Department").

interference claim.  (D. 206).  For the reasons that follow, the Mayor's motion is denied.

## I.  <u>THE PARTIES' ARGUMENTS</u>

The Mayor's lead argument concerns a purported uncertainty and ambiguity as to which contract the jury found he had interfered with, the Tri-Partite Agreement or one or more of the purchase and sale agreements.  To that end, the Mayor argues that using the word "or" in the verdict form rendered the jury's findings on the contractual interference claim unclear, uncertain, and ambiguous.[3] Per the Mayor's argument, there was no evidence of a breach of the Tri-Partite Agreement, which simply expired and was not renewed, and the jury therefore could not rest its findings on this unsupported and invalid ground.  (D. 207, pp. 7-9) (D. 230, pp. 1-3).  Further, if the jury found that the Mayor induced a breach of one or more of the four purchase and sale agreements, there was no competent, non-hearsay evidence to support such a breach.  (D. 207, p. 8).

Maroney argues in opposition that the Mayor waived the argument regarding the verdict form's use of the word "or" by not raising it in a Rule 50(a) motion and not calling it to the court's

---

[3] Question one on the verdict form asked the jury if Maroney had a binding contract with the City's Planning Board and the Five Cent Savings Bank, which the Mayor correctly equates to the Tri-Partite Agreement (D. 207, p. 7) (Ex. 31), "*or* a binding purchase and sale agreement with one or more buyers . . . ." (D. 197) (emphasis added).

attention during the trial.  Regardless, according to Maroney, there was no fundamental error in using the word "or" to warrant a new trial.  Maroney also purports to identify competent and sufficient evidence for the jury to find a breach of the four purchase and sale agreements.  (D. 219).

Next, with respect to the court's summary judgment opinion (D. 127), the Mayor argues that the court's "findings should have ended the case and the trial should not have proceeded against the Mayor" on the contractual interference claim.  This is so because the court determined on summary judgment there was no evidence for a jury to find that the Mayor influenced Ward in denying the permits.  In fact, so the Mayor contends, the evidence presented at summary judgment was the same evidence presented at trial.  (D. 207, pp. 9-11).  Maroney responds in opposition that the trial record included different exhibits and, in contrast to the deposition transcripts at summary judgment, different direct and cross examination testimony.  He also points out that the trial allowed the jury to assess the credibility of each witness.  (D. 219, pp. 17-19).

The Mayor presents four additional arguments.  First, he argues that the verdicts on both the contractual interference and the business relationship claims cannot be reconciled.  On the one hand, the jury found that the Mayor interfered with an existing contract.  On the other hand, the jury found that the Mayor did

not interfere with any prospective business relationship.  The Mayor reasons that both findings depended on the same conduct, namely, Ward's refusal to sign-off on permits, Ward's actions in changing the design of a water booster station, and Ward's recommendation against extending the Tri-Partite Agreement.  (D. 207, pp. 13-14).  In response, Maroney asserts that the Mayor acted independently, as opposed to through Ward, by making the statements that Maroney's permits depended upon Maroney dropping a state court lawsuit.[4]  Maroney further argues that the jury could have concluded that the prospective business relationships with future buyers were too remote or speculative.  (D. 219, p. 20).  As such, the finding on the business relationship claim did not depend on Ward's conduct.

Second, the Mayor maintains that a state court ruling from a lawsuit Maroney had filed in July 2015 provided that Maroney had until November 1, 2016 to build the water booster station.  The Mayor argues that he therefore could not have caused the purported harm of withholding the permits after July 2015, because Maroney was in fact permitted to build the water booster station up until that time.  (D. 207, p. 12).  Maroney counters that he tried to build the water booster station between August 2015 and November

---

[4] As explained in the factual background, Maroney filed suit in Massachusetts Superior Court (Essex County) against Ward, the Planning Board, and various Haverhill officials, albeit not the Mayor, for impeding Maroney's development of Crystal Springs and refusing to issue permits.

1, 2016 but was unsuccessful in doing so.  In addition, he submits that the contractual interference claim was complete when the buyers canceled the purchase and sale agreements, causing Maroney to lose each deposit and sale.  (D. 219, pp. 14-15).

Third, the Mayor argues that this court erred when it allowed Maroney to inform the jury that the state court, in ruling on a preliminary injunction motion, found that Maroney had shown a likelihood of success, but did not allow the Mayor to add that the state court ultimately ruled in the City's favor.  (D. 207, p. 12).  Maroney counters that the court balanced the jury's need to understand the context of the state court proceedings against the confusion and prejudice that might result by admitting additional evidence regarding the outcome of the proceedings.  (D. 219, p. 20).

Fourth, the Mayor contends that testimony by Rosemary Scalera, Maroney's real estate broker for the project, was hearsay and introduced over the Mayor's objection.  (D. 207, p. 13).  As described by the Mayor, Scalera testified about her belief regarding why the buyers with four purchase and sale agreements (Ex. 25, 26, 28, 30) did not purchase the homes.  The Mayor adds that these four purchase and sale agreements had expired.  (D. 207, pp. 8, 13).  Maroney in turn points to Scalera's understanding that these buyers withdrew from their agreements because they lost confidence that the sales would occur based on the Mayor's

statements.  (D. 219, pp. 11-14).  He argues separately that her testimony dispels the Mayor's characterization of the four purchase and sale agreements as expired.

## II.  PROCEDURAL BACKGROUND

As noted, Maroney originally filed this action against the Mayor and Ward.  In May 2023, the court allowed summary judgment on the remaining claims against Ward.  The court also allowed summary judgment on the remaining claims against the Mayor except for the intentional "interference with contractual or economic relations claim."[5]  (D. 127, p. 63).

In a subsequently filed joint motion, Maroney and the Mayor sought "input from the Court" regarding the viability of a trial and noted the parties' contemplation of filing motions for reconsideration.  (D. 130).  Accordingly, the court held a status conference in late May 2023.  During that conference, the court counseled the parties not to rely on the facts set out in the summary judgment opinion as binding for purposes of the pending trial.[6]  The court also stated that Federal Rule of Civil Procedure

---

[5] The court advised the parties at the final pretrial conference that the case would proceed on two claims, to which the Mayor did not object.  (D. 179, pp. 6-7).  The Mayor did make a footnote comment in the jointly proposed instructions that the business relationship claim was not properly plead (D. 165, p. 19, n.18), but he did not renew that concern at the charge conference.

[6] For example, the court advised the parties that:

> Nobody would be precluded from making any arguments or offering any facts based on any ruling we made.  So to the extent that concern was in there about whether anything in our ruling impacted what a party could do at trial, from where we sit, it does not . . . After all,

56(g) ("Rule 56(g)") provided a mechanism to treat a factual finding as established in the case but that "[n]obody made that request" and the court did not "make those sorts of findings here." (D. 178, p. 13).

In early June, the Mayor filed a motion for reconsideration based on Rule 56(g) and the law of the case. He argued therein that the court determined on summary judgment that a reasonable juror could not find that Ward was following the Mayor's directives in changing the water booster pump design in January 2016 or opposing the extension of the Tri-Partite Agreement in the fall of 2016. (D. 142). The Mayor maintained that these findings necessitated summary judgment in the Mayor's favor on the interference with contractual or economics relations claim. (D. 142). In late June, the court denied the Mayor's motion for reconsideration in a Memorandum and Order. (D. 149, pp. 3-12).

The Mayor raised the same issue of the preclusive effect of the summary judgment ruling in the parties' joint pretrial memorandum. (D. 163, p. 12). At the August 4, 2023 final pretrial conference, the Mayor's counsel reiterated that the summary

---

we're not making credibility findings. We're not -- we're drawing all inferences in the light most favorable to you as the party opposing summary judgment, but it would be up to a jury to then get all of that evidence and to decide, as you suggested, whether there are reasonable inferences they can draw from it as to whether the mayor did or did not direct Mr. Ward.

(D. 178, pp. 5, 7).

judgment finding precluded a trial.   (D. 179, pp. 10-11, 14).
During the conference, the court acknowledged that the Mayor's
"rights on [the matter] are preserved."   (D. 179, pp. 14, 17).

The case proceeded to trial on the two remaining claims
against the Mayor.  As noted, the jury awarded Maroney $928,775 on
the contractual interference claim.  The Mayor presently moves for
judgment as a matter of law or, alternatively, for a new trial.

## III.  <u>STANDARD OF REVIEW</u>

Under Rule 50(b), a jury "verdict should be set aside only if
the jury failed to reach the <u>only</u> result permitted by the
evidence." *Lestage v. Coloplast Corp.*, 982 F.3d 37, 46 (1st Cir.
2020) (citation omitted); *see Blomquist v. Horned Dorset
Primavera, Inc.*, 925 F.3d 541, 546 (1st Cir. 2019) ("[D]istrict
court's denial of a Rule 50(b) motion for judgment as a matter of
law" is sustained "unless the evidence . . . could lead a
reasonable person to only one conclusion, namely, that the moving
party was entitled to judgment.").  In adjudicating a Rule 50(b)
motion, the court construes the "facts in the light most favorable
to the jury verdict, draw[s] any inferences in favor of the non-
movant and abstain[s] from evaluating the credibility of the
witnesses or the weight of the evidence." *Suero-Algarín v. CMT
Hosp. Hima San Pablo Caguas*, 957 F.3d 30, 37 (1st Cir. 2020)
(citation omitted).  It is also well established that a "failure
to raise an issue prior to a Rule 50(b) motion for judgment as a

matter of law, without more, results in a waiver of that issue on appeal." *Falto De Román v. Mun. Gov't of Mayagüez*, 46 F.4th 51, 55 (1st Cir. 2022) (citation omitted); *Jones ex rel. U.S. v. Mass. Gen. Hosp.*, 780 F.3d 479, 487 (1st Cir. 2015).

The court's power to allow a Rule 59(a) "motion for a new trial is much broader than its power to grant a Rule 50(b) motion." *Falto*, 46 F.4th at 56 (citations and internal brackets omitted). Rule 59(a) "authorizes a district court to override a jury verdict and order a new trial 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" *Teixeira v. Town of Coventry by & through Przybyla*, 882 F.3d 13, 16 (1st Cir. 2018) (citation omitted); *accord Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 27 (1st Cir. 2019) ("[D]istrict court may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice.") (citations omitted).  In adjudicating a Rule 59(a) motion, "[t]he court may, though it is not required to, weigh the evidence and credibility of the testimony." *Mejias-Aguayo v. Doreste-Rodriguez*, 863 F.3d 50, 54 (1st Cir. 2017).  Rule 59(a) therefore allows the trial judge to "'independently weigh the evidence'" and, further, "the judge 'may consider the credibility of the witnesses who testified.'"  *Jones,* 780 F.3d at 492 (citations omitted).  Nevertheless, "[i]n general, conflicting

testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *Blomquist*, 925 F.3d at 551 (citation omitted).  Where "a motion for a new trial is at bottom, based on sufficiency of the evidence, the standards under Rule 50 and Rule 59 effectively merge." *Rodríguez-Valentin v. Doctors' Center Hosp. (Manati), Inc.*, 27 F.4th 14, 21 (1st Cir. 2022) (citation and quotation marks omitted).

## IV.  **FACTUAL BACKGROUND**

### A.  **Subdivision Approval and Tri-Partite Agreements**

In 2009, the Planning Board of the City of Haverhill (the "Planning Board") approved a definitive subdivision plan of fifty residential lots.  (Ex. 85).  The development, commonly known as Crystal Springs, consisted of 16 residential lots on Back Nine Drive and 34 residential lots on Front Nine Drive.  (Ex. 85).  The lots on Front Nine Drive had higher elevations than those on Back Nine Drive.  (D. 226, p. 154).[7]  Notably, the definitive subdivision plan required Maroney to build a water booster station.  It did not, however, set a deadline to complete the construction.  (Ex. 85) (D. 201, p. 124).

To ensure that Maroney completed the utilities for the project, including building the water booster station, the City

---

[7] Citations to the trial transcripts are provided for convenience.  They are not necessarily the only places in the trial record that support the cited recitation.

required a bond, which was done through the Tri-Partite Agreement. (D. 243, pp. 22-23) (Ex. 8, 31).  Maroney repeatedly testified that he could either build the booster station or "bond it," meaning he could wait until the end of the bond, i.e., the end of the Tri-Partite Agreement in effect at the time, to build the water booster station.  (D. 201, pp. 87, 94) (D. 202, pp. 57, 75).  In that regard, the pertinent language in the definitive plan states: "No building permit will be issued until all of the utilities shown on the plans to provide service to the proposed structure are installed and tested, *or* a security bond is posted for such work." (Ex. 85) (emphasis added).  The reference to "utilities" encompassed the water booster station.  (D. 234, pp. 21-22).  To avoid triggering the Planning Board's right to draw on the remaining funds under the irrevocable letter of credit in the last Tri-Partite Agreement, the agreement required the completion "of ways and the installation of municipal services" by November 1, 2016.  (Ex. 31).

To build the houses on the lots, Maroney first needed to obtain a release of the lots from the Planning Board.  Under the first Tri-Partite Agreement, the Planning Board released the sixteen Back Nine Drive lots in return for the bank issuing an irrevocable letter of credit.  (Ex. 8).  Under the last Tri-Partite Agreement, the Planning Board released twenty Front Nine Drive lots.  (Ex. 31).  Once the Planning Board released the lots and

12

the department heads signed off on a site plan for a released lot, Maroney had to apply to the City's departments to obtain permits. For example, he needed to apply to the Building Department to obtain a foundation permit and thereafter a building permit.  (D. 243, pp. 27-28, 74) (D. 202, p. 95).  Without a sign-off from each department, including the Water Department, Maroney could not obtain a building permit.  (D. 202, pp. 31, 59, 95) (D. 226, p. 156).

## B.  Events Leading to March 2015 Decision to Stop Issuing Permits

By 2012, Maroney had completed the houses on the Back Nine Drive and started building houses on Front Nine Drive.  (D. 201, pp. 108-109).  During this time, Ward "wanted to know when [Maroney] was going to begin" building the water booster station. (D. 201, p. 108).  From 2012 through 2014, efforts to arrive at an agreed schedule, including benchmarks, to complete the construction were not successful.  (D. 202, pp. 74-75).

In April 2013, Maroney hired an engineer, Bruce Lewis, for the project.  (D. 236, p. 17).  He advocated for "a stick-built pumping station," in other words, a water booster station built "in the field, on site" ("stick-built").[8]  (D. 226, p. 161).  The City's specifications, however, called for "a factory-built pump system" mounted on "a steel skid" ("skid design").  (D. 226, p.

---

[8] At various times, witnesses used interchangeable terms to refer to a stick-built pump system, such as a field-built or as-built pump system.

161) (Ex. 82, p. 4).  The City's specifications also required a standard product for the pump system manufactured by Engineered Fluid, Inc. ("EFI") or by one of a few other companies.  (Ex. 82, p. 4).

Over time, Ward grew increasingly concerned that Maroney was not ever going to build the water booster station.  (D. 226, p. 158).  In late 2013, Maroney and Lewis stopped communicating with the Water Department, according to Ward.  (D. 226, p. 162).  Maroney, in turn, explained that 2013 was a slow year for sales and he therefore "put Lewis on hold."  (D. 243, p. 59).

On a few occasions since "at least 2013," Ward told Maroney "that, to keep this project moving, he needed to show some good faith that he was actually going to build [the water booster] station." (D. 226, p. 165).  Per Ward's testimony, he told Maroney that starting the foundation or constructing the building for the water booster station "would show good faith."  (D. 226, p. 166).

In or around March 2015, Ward "directed the [W]ater [D]epartment to stop issuing" permits for any of the lots.  (D. 226, pp. 164-165) (D. 243, p. 74).  As a result, Glen Smith, the water maintenance supervisor and the individual who "reviewed and approved the water service applications for each of the houses," stopped approving those applications in early 2015.  (D. 226, pp. 104, 162, 164).  The impetus for Ward's decision was that "there was nothing going on with the" water booster "station and the

houses were being built."  (D. 226, pp. 164-165) (D. 220, p. 13).

Smith concurred with Ward's decision and the impetus for it.[9]  (D.

226, pp. 105-106).

## C.  Events Surrounding the State Court Lawsuit and the Court's Instructions Regarding the Lawsuit

In April 2015, Ward, Maroney, and other City officials had a

meeting "to try to reach an agreement about the water booster

station and the permits."  (D. 226, p. 138).  At that juncture,

Ward and others "were still trying to keep the project moving."

(D. 226, p. 165).  After the meeting, a proposed draft agreement

among Maroney, the Planning Department, and the Water Department

was circulated to Ward, Maroney, John D'Aoust, William Pillsbury,

and others.[10]  In addition to other deadlines, the tentative

agreement set dates for Maroney to complete the engineering plans

for the water booster station, install a water main line, and

complete the water booster station.  (D. 226, pp. 166-167) (Ex.

37) (D. 202, pp. 42-43, 47-48).  It also stated that "[t]he Water

Department shall share" a "new Hydraulic Analysis Report (2015)"

by Wright-Pierce "with [Maroney] upon its receipt of" the report.[11]

(Ex. 37).  Maroney refused to sign the agreement, partly because

---

[9]  More precisely, Smith agreed with Ward's decision "until we get an understanding of what we can serve and what we can't serve."  (D. 226, p. 106).

[10]  D'Aoust was the City's water treatment plant manager.  Pillsbury was the director of the Planning Department.  (D. 201, p. 75).

[11]  Wright-Pierce was the City's engineer and design consultant.  (D. 226, p. 62).

the department had received the report but was not sharing it, as well as his concern "that the Wright-Pierce report would determine that most of [his] proposed houses were not serviceable."  (D. 202, pp. 44-50, 55).

That summer, Maroney began building houses on a number of Front Nine Drive lots without building permits.  (D. 202, pp. 51-52).  As a result, Richard Osborne, the City's building inspector, issued cease and desist orders on July 15, 2015, along with an admonition that Maroney would incur fines of $1,000 per day if he ignored the orders and continued to build on the unpermitted lots.  (Ex. 40) (D. 202, pp. 52-53, 59).

In mid-July 2015, Maroney filed the state court lawsuit against the City, Pillsbury, Ward, and Osborne.  (D. 202, p. 59).  As noted, the Mayor was not a defendant.

Almost immediately after the jury heard this testimony that Maroney filed the state court lawsuit, the court read the following instruction to the jury:

> I want to say just a few words to you about this state court suit that you've been hearing about.  So this is how I instruct you to process any information that you may hear.  You have heard evidence that Mr. Maroney filed a lawsuit in state court against a number of Haverhill officials in July of 2015.  You will hear that there was a preliminary hearing in that state court case in August of 2015.  You will hear about the results of that preliminary hearing.  This evidence is being admitted for the limited purpose of the effect of the results of that hearing on the state of mind of the parties in this case at that time and for no other reason.  You will hear that the case -- the state court case -- continued on for some years and

eventually concluded.  The results of the state court case
are not relevant here and you should not speculate about
the results of that matter.

(D. 202, pp. 58-59).

As the testimony unfolded thereafter, in August 2015 Maroney
asked the state court to issue a preliminary injunction to obtain
the building permits immediately.  The state court conducted a
hearing on that request in mid-August.  (D. 202, pp. 61-62).
During the hearing, the state court judge instructed the parties
and their counsel to "go out in the hallway and see if you can
work this out." (D. 202, p. 63).  After Maroney, his counsel, and
the City's counsel returned to the courtroom, the City's counsel
reported they had an agreement, which he described as a global
settlement.  (D. 202, pp. 64-66).  It nevertheless quickly became
apparent that the group did not have a global settlement.  (D.
202, pp. 66-67).  Shortly thereafter, the judge issued an opinion
denying the request for a preliminary injunction.  (D. 202, pp.
66-67, 78-79).  Counterbalancing this testimony, the court stated
the following to the jury shortly thereafter:

> So you had heard that the state court judge did not grant
> the preliminary injunction that Mr. Maroney requested.
> That has been established.  I just want you to understand .
> . . that the state court judge also said, and I'm quoting
> from a state court document, that "The plaintiffs have
> shown a likelihood of success on the merits of their
> contractual claims."[12]

---

[12] The above provides the backdrop for the Mayor's argument regarding this
court's exclusion of the state court's ultimate decision in the defendants'
favor.  As shown in the previously quoted instruction, this court allowed the
jury to hear that the state court judge *denied* the preliminary injunction but

(D. 202, pp. 90-91) (emphasis added).

## C. __The Mayor's Statements__

Prior to the state court lawsuit, the Mayor wanted the project to move forward and was working with Maroney to facilitate that process.  (D. 201, p. 104) (D. 226, pp. 158-159) (D. 202, p. 68, ln. 9-10).  A series of statements the Mayor made in August and September 2015, however, evidenced a change in the Mayor's attitude after Maroney filed the state court lawsuit in mid-July 2015.  In essence, as detailed below, these statements communicated to buyers with purchase and sale agreements, existing Crystal Springs residents, the real estate broker for the development, and other individuals, including Maroney, that he was not going to get any more permits unless he dropped the state court lawsuit.

In August 2015, Scalera, who, in addition to being Maroney's real estate broker, was a Back Nine Drive resident, organized a meeting with the Mayor to address the stop in the construction because of the failure to build the water booster station ("Crystal Springs meeting").  (D. 238, pp. 32-35).  The purpose of the meeting was to see if the City could help rectify the situation. (D. 238, p. 35).  At the time, there were a total of nine purchase and sale contracts with buyers waiting to have their homes

---

excluded the results of state court lawsuit that ruled in the defendants' favor in 2018.

completed.  (D. 238, pp. 35, 38).  The individuals attending the meeting included approximately five or six existing residents of Front Nine Drive as well as buyers with purchase and sale contracts "that had not yet closed." (D. 238, p. 37).  The Mayor's Assistant and City Solicitor, Bill Cox, Esq., also attended the meeting, which took place in the Mayor's office.  (D. 238, pp. 35-37, 49).

When asked why she went to the Mayor as opposed to other City officials, Scalera replied, "Because he's in charge of everything." (D. 238, p. 35-36).  Whereas the Mayor "deferred to the departments [for their] day-to-day operations," he "set the tone and the direction for the city departments," a category that included the Water Department.  (D. 226, p. 51).

For context, this Crystal Springs meeting took place after the state court denied the preliminary injunction motion.  (D. 202, p. 79).  Shortly after the August 27th meeting began, the Mayor asked the group if they were aware that Maroney had filed a lawsuit against the City.  (D. 238, p. 39) (D. 201, p. 28). Throughout the meeting, the Mayor repeatedly stated, "It's up to Mr. Maroney.  He knows what he has to do." (D. 238, pp. 39-42) (D. 201, p. 67).  More specifically, the Mayor stated that, "If [Maroney] drops the [state court] lawsuit, he'll get the permits." (D. 238, p. 42).  Rosemary Deyermond, a resident of Front Nine Drive who went to the meeting, was particularly shocked and surprised about the Mayor's statement that "[w]hen Mr. Maroney

drops his lawsuit, he'll have his permits." (D. 201, pp. 62, 66-67). She described the statement as "extortion" and the Mayor's tone as "very frustrated." (D. 201, p. 68).

In late August, Francis Healey, a friend of Maroney's, stopped by the Mayor's office to discuss the Crystal Springs development. When he told the Mayor the reason for the visit, the Mayor's demeanor immediately changed. Specifically, he "stood up, put one hand on his desk," pointed his other finger at Healey, and yelled, "I know Maroney sent you down here." (D. 236, pp. 55-56). When Healey suggested that the Mayor meet again with Maroney, the Mayor responded by stating, "Tell [Maroney] to drop the lawsuit." (D. 236, p. 56). As the meeting was ending, the Mayor directed Healey to "tell Maroney to drop the lawsuit and he can have all the permits he wants" and that "[i]f he doesn't drop the lawsuit, he'll never see another permit while I'm mayor." (D. 236, p. 57).

In early September, Maroney received a telephone call from the Mayor asking for a meeting. (D. 243, p. 88). At the outset of the meeting, the Mayor expressed an interest in resolving the case. (D. 226, p. 39) (D. 243, p. 88). During the ensuing meeting, the Mayor acknowledged that the City owed Maroney for lost sales but also indicated that Maroney owed the City $250,000 for building houses on unpermitted lots. (D. 243, pp. 88, 91). Maroney disagreed. Similar to prior statements, the Mayor told Maroney to "drop the lawsuit and you can have all the permits you want." (D.

243, p. 91).   The Mayor also suggested that they proceed to mediation.[13]  (D. 226, pp. 40, 42) (D. 243, p. 92).

After the Mayor's statements, the buyers of four properties canceled their purchase and sale agreements.  (Ex. 25, 26, 28, 30) (D. 243, pp. 96-97).  First, the buyers of two of the properties (Leonard and Suzanne DiLorenzo and Roger and Cheryl Preston) canceled their purchase and sale agreements shortly after the Crystal Springs meeting.  (D. 243, pp. 96-97) (Ex. 25, 30).  Next, Robert and Nancy Rainville "took a little longer" to cancel their purchase and sale agreement.  (D. 243, p. 97) (Ex. 28).  Finally, Richard and Sheila Daly had entered into a purchase and sale agreement for the fourth property, i.e., lot seven on Front Nine Drive.  (Ex. 26).  Stamped three times across a May 19, 2016 treasurer check payable to the Dalys and Maroney Construction is the word "VOID."  (Ex. 25).[14]  The memo on the check reads, "Lot 7 Deposit return."[15]  (Ex. 25).

**D.   <u>Post-Lawsuit Events</u>**

The Mayor typically held weekly meetings with the heads of the City's departments.  In that regard, from 2013 through 2016 he

---

[13] At least one additional meeting took place in September during which the Mayor expressed an interest in mediation.  Maroney rejected the idea.  (D. 243, pp. 92-93).

[14] The check is incorrectly placed in exhibit 25, the DiLorenzos' purchase and sale agreement.

[15] The jury could therefore find that the Dalys canceled their purchase and sale agreement after the Mayor's statements and no later than May 2016.

met with Ward as well as Michael Stankovich, the Water Department director.  (D. 226, pp. 23, 48).  Additionally, "[a]t various times, [the Mayor] would get updates, primarily from [Ward], about the water booster station and [the] negotiations with [Maroney]." (D. 226, p. 85) (emphasis added).

In mid-September 2015, Maroney made a written offer to the City in which he set out a schedule to construct the water booster station by September 15, 2016.  (Ex. 46) (D. 243, pp. 102-103). The offer provided a signature line for the Mayor to accept the offer.  When the Mayor did not sign the proposed agreement, Maroney forwarded it to Ward on September 25, 2015.  The offer did not result in an agreed-upon schedule.

In November 2015, Maroney installed a water main line at a cost of $160,000.  (D. 243, pp. 101-102, 122).  Although Maroney told Ward that he viewed the water main line as a good faith effort towards the water booster station, Ward responded "[t]hat it was not a good faith effort towards doing anything with the pump station."  (D. 226, p. 177) (D. 243, p. 122).

In early January 2016, Lewis, Maroney, Ward, and D'Aoust had a meeting in an office at the Water Department.  (D. 220, pp. 17, 41) (D. 243, p. 108).  Maroney and Lewis brought their plans for a stick-built water booster station to the meeting.  (D. 243, p. 108).  By that time, Lewis had addressed the majority of issues identified by Wright Pierce, and Wright Pierce had concluded his

responses were acceptable.  (D. 226, p. 121, ln. 20-24).  During the meeting, Ward informed Maroney and Lewis that they had "[t]o go with an EFI pump type skid."  (D. 220, p. 17) (D. 226, pp. 107-108).  The decision came as a surprise to Lewis and Maroney.  Lewis testified that, although he knew that "Wright Pierce was advising the [C]ity" that "it would be better . . . to use an EFI system," he "was never told until January 4 of '16 that EFI had to be used." (D. 236, pp. 22-23).  In fact, up until the January 2016 meeting, no one told Lewis that he had to use EFI.[16]  (D. 236, p. 23).

Similarly, no one told Maroney that he could not use a stick-built design or pump system.  (D. 243, pp. 108-109).  Relatedly, Maroney testified that the Water Department was approving the stick-built station while Maroney or Lewis was designing it.  (D. 201, p. 119).  To be sure, Maroney recognized that the Water Department was used to maintaining a water booster station with an EFI pump system.  (D. 201, p. 117).  Even so, Maroney remained steadfast that the City allowed him to do a stick-bult pump system. (D. 201, p. 119, ln. 23).

---

[16] In contrast, D'Aoust recalled speaking by telephone with Lewis in September 2014.  D'Aoust further testified that he remembered telling Lewis that the Water Department's "decision was to move forward with a skid-based design that meets the City's specifications."  (D. 226, p. 100).  At his July 2020 deposition, however, D'Aoust did not recall this telephone call.  (D. 226, p. 128) (responding "I did not" to  question asking, "But you didn't recall that phone call when you were deposed in July of 2020, did you?").  Thus, viewing the facts in favor of the verdict for purposes of the Rule 50(b) motion and by weighing the evidence for purposes of the Rule 59(a) motion, no one told Lewis that he had to use EFI before the January 2016 meeting.

After the meeting, Lewis promptly contacted EFI and interacted with the company's local sales representative. (D. 243, pp. 109-112) (Ex. 65). That spring and summer, delays ensued regarding fire flow tests for the water booster station. Maroney asked the City to perform data logger tests in April and May of 2016. (D. 220, pp. 46-47) (Ex. 67). The City, however, did not make the water lines and fire hydrants available for testing from April to July 2016. (D. 220, p. 47).

In the fall of 2016, the Planning Board held meetings in September and October to address Maroney's request to extend the Tri-Partite Agreement. (Ex. 75, p. 2) (Ex. 77, p. 3). At the September 2016 meeting, Ward spoke out against allowing additional time for Maroney to complete the water booster station. (Ex. 75, p. 4). Previously, Ward "had never spoken out against a request to extend a tripartite agreement" at a Planning Board meeting. (D. 220, pp. 48-49). The Planning Board continued the matter to the October meeting. (Ex. 75, pp. 21-22). At the October 2016 meeting, Ward similarly recommended against extending the time to build the water booster station. (Ex. 77, p. 5). Maroney in turn spoke in favor of extending the Tri-Partite Agreement. (Ex. 77, p. 15). In the end, the Planning Board voted to extend the time to install municipal services, "with the exception of the water

booster station to November 1, 2017."[17]  (Ex. 77, pp. 49-51).  The Planning Board also voted "to draw against the funds available in [the Tri-Partite Agreement] to complete the design and installation of the water booster station."  (Ex. 77, pp. 51-52).

At the next meeting in November 2016, the Planning Board voted "to instruct the special counsel to take" the necessary steps to obtain disbursement of the funds from the bank to complete "the remaining work on the Crystal Springs" development.  (Ex. 79, p. 10).  Lacking his own funds to build the water booster station, including the ability "to draw off [his] line of credit" from the Lowell Five Cents Savings Bank, Maroney could no longer build and sell any of the remaining homes on Front Line Drive.  (D. 201, pp. 6-7).  Eventually, a new developer took over the property, built the water booster station, and completed the project by 2022.  (D. 201, p. 11).

## E.   Damages

At the time the bank foreclosed on the property in 2017, Maroney had nineteen homes to build and, including the model home, twenty homes to sell on Front Nine Drive.  (D. 201, pp. 9-11).  It therefore stands to reason that in the fall of 2016 Maroney had

---

[17] To be precise, the Planning Board allowed a motion "to extend the time to complete the construction of way[s] and the installation of . . . municipal services . . . with the exception of the water booster station, to November 1, 2017" through "an executed tripartite agreement on or before November 1, 2016, approved as to form" by the Board's legal counsel.  (Ex. 77, pp. 49-50).  References to an extension or renewal of the September 2014 Tri-Partite Agreement is a shortform means of referring to this precise action.

twenty homes yet to sell when the Planning Board decided to extend the Tri-Partite Agreement exclusive of the water booster station.

The average construction cost for Maroney to build a home was $226,000.  (D. 201, p. 13) (Ex. 87, 92).  In addition to the construction cost, Maroney testified that he incurred road construction costs which, "[i]nclusive of the water booster station," totaled $708,000 for the remaining twenty homes on Front Line Drive, or $35,400 per home.  (D. 201, p. 14).  He also had to pay a real estate broker's fee.

As opined by Maroney's expert, Jeffrey Dennis, the anticipated net profit for completing and selling the twenty remaining homes "was in excess of $6 million" or, specifically, $6,098,160.  (D. 234, pp. 115, 117).  In arriving at this figure, and based on information provided by Maroney, Maroney's expert explained the straight-forward calculation of the lost net profit. (D. 201, pp. 11-14).  He began with an estimated average sales price for each of the twenty homes as $600,000 yielding an aggregate total of $12,000,000.  (D. 234, p. 114).  From this, he subtracted the construction costs, which, on average, were $226,956 per house.  (D. 234, p. 112) (Ex. 92).  He also subtracted the road construction costs ($708,000), inclusive of the water booster station.  (D. 234, p. 113) (Ex. 93).  Lastly, he "subtracted a real estate commission of 5 percent and state tax stamps."  (D. 234, p. 114) (Ex. 94).  In total, the lost net profit

due to Maroney's inability to sell the remaining twenty houses after the Planning Board denied an extension for the water booster station was slightly more than six million dollars.  (D. 234, pp. 115, 117).

Maroney's expert did not deduct any loan payments from the $12,000,000 gross profit.  (D. 234, p. 117).  When queried on cross examination, he acknowledged not deducting the interest payments on Healey's private loans to Maroney, which totaled approximately $360,000.  (D. 236, p. 53).  By way of background, Healey and his mother-in-law each loaned Maroney $50,000 in January 2010 at a rate of fifty percent per year.  Thereafter, Healey's mother-in-law died, and Healey paid the estate the money Maroney owed to her on the $50,000 loan.  Maroney and Healey then entered into a promissory note in which Maroney agreed to pay Healey $114,583 at an annual interest rate of twelve percent.  (D. 236, pp. 53, 60-67).  Thereafter, Healey loaned Maroney $80,000.  (D. 236, p. 53).  Additional facts, where relevant, are set out when addressing the parties' arguments.

## V.  DISCUSSION

### A.  Legal Overview

A tortious interference with contractual relations claim requires the plaintiff to show "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3)  the  defendant's  interference,  in  addition  to  being

intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Eaton v. Town of Townsend*, Nos. 22-1334, 22-1335, 2023 WL 3317986, at *11 (1st Cir. May 9, 2023) (citations and internal ellipses omitted); *accord Psy-Ed Corp. v. Klein*, 947 N.E.2d 520, 536 (Mass. 2011).  To establish an interference with advantageous business relations claim, a plaintiff must show:  "(1) a business relationship for economic benefit with a third party; (2) the defendant's knowledge of that relationship; (3) the defendant's interference with that relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff's loss of advantage directly resulting from defendants' improper conduct." *Orkin v. Albert*, Civil No. 21-40060-LTS, 2023 WL 1452055, at *10 (D. Mass. Feb. 1, 2023); (citation omitted); *accord Bartle v. Berry*, 953 N.E.2d 243, 250 (Mass. App. Ct. 2011) (citation omitted).

**B.  <u>Uncertainty in Verdict with One Basis Moreover Invalid</u>**

As noted, the Mayor maintains that using the word "or" in question one of the verdict form rendered the jury's findings on the contractual interference claim unclear, uncertain, and ambiguous.  (D. 207, pp. 7-9).  Per the Mayor's argument, because there was no evidence of a breach of the expired Tri-Partite Agreement, the jury could not rest its findings on this unsupported

and invalid ground.[18]  Further, with respect to the four purchase
and sale agreements, there was no competent, non-hearsay evidence
as to why these buyers did not purchase the homes, according to
the Mayor.  Put another way, there was no evidence that these
buyers canceled their agreements because of the Mayor's
statements.  Rather, the only evidence consisted of Scalera's
hearsay testimony of her belief.  (D. 207, pp. 8, 13).  The Mayor
adds that the agreements were expired, and further points out that
Maroney did not build the booster station by November 1, 2016 and
Ward never signed off on the building permits for the four homes.
Consequently, so the Mayor argues, there was no evidence that the
Mayor caused Maroney any harm.[19]

Maroney maintains that the verdict's use of the word "or" was
not a fundamental error.  He additionally asserts that sufficient
evidence in the record allowed the jury to find that the Mayor
interfered with the purchase and sale contracts.  Further, he
argues that the Mayor waived these arguments by not raising them

---

[18] Although the first question in the verdict form did not expressly ask the
jury to find a "breach," the jury instructions linked the requirement of a valid
contract to a contract that "was *breached as a result* of the [M]ayor's conduct."
(D. 211, p. 139) (emphasis added).  The parties proposed this instruction prior
to trial and did not object to its inclusion at the charge conference.  (D.
165, p. 8) (D. 211, pp. 67-82).  The *Massachusetts Superior Court Civil Practice
Jury Instructions*, which the parties cited, includes the same language.  *See* II
Joseph D. Lipschitz et al., *Massachusetts  Superior Court Jury Instructions* §
12.4.2 (3d ed. 2014) (" . . . which contract was breached by the third party as
a result of the defendant's conduct").

[19] The Mayor groups all of the above arguments under a single subheading vis-à-
vis the uncertainty as to the verdict.  The court adheres to this framework.

in the Rule 50(a) motions (D. 189, 193).  (D. 219, pp. 1, 6-10).
The Mayor characterizes this argument as "nonsensical because the
proposed verdict form was not issued, and the charge [conference]
was not held, until after the directed verdict motion was filed."[20]
(D. 230, p. 3).

### 1.  **Rule 50(b) Waiver**

Even though the Mayor is correct about the timeline, he is
incorrect regarding the Rule 50(b) waiver.  The First Circuit has
"'held in no uncertain terms' . . . that a 'failure to raise an
issue prior to a Rule 50(b) motion for judgment as a matter of
law, without more, results in a waiver of that issue on appeal.'"
*Jones*, 780 F.3d at 487 (citations omitted); *see Cornwell Ent.,
Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 25 (1st Cir.
2016) ("[M]ovant cannot use [Rule 50(b)] motion as a vehicle to
introduce a legal theory not distinctly articulated in its Rule
50(a) motion.") (internal brackets omitted).  Hence, "[t]he Rule
50(a) motion 'must be sufficiently specific so as to apprise the
district court of the grounds relied on in support of the motion.'"
*RFF Fam. P'ship, LP v. Ross*, 814 F.3d 520, 536 (1st Cir. 2016).

Critically, a movant can submit a Rule 50(a) motion "at *any*
time before the case is submitted to the jury." Fed. R. Civ. P.
50(a) (emphasis added); *see Santos-Arrieta v. Hosp. Del Maestro*,

---

[20] The Mayor brought two, virtually identical Rule 50(a) motions.  He filed
the second motion (D. 193) before the court conducted the charge conference
addressing the instructions and the verdict form.  (D. 211, p. 66).

14 F.4th 1, 10 (1st Cir. 2021).  The First Circuit in *Santos-Arrieta* rejected the movant's argument "that it couldn't have argued about [an expert witness] in its Rule 50(a) motion because [the witness] had not yet testified at that point in the trial." *Id.*  Not only did the court cite cases allowing more than one Rule 50(a) motion, but it quoted Rule 50(a), which allows a movant to file a Rule 50(a) motion "at <u>any time before</u>" submitting the case to the jury.  *Id.*  Here too, where the Mayor had already previously filed two Rule 50(a) motions, the Mayor could have waited to file the third Rule 50(a) motion until *after* the charge conference, during which the court addressed the verdict form.

To be sure, the movant's failures in *Santos-Arrieta* were more egregious than omitting an argument from a Rule 50(a) motion.  *See id.* at 10-11 (leaving out argument from Rule 50(a) and 50(b) motions and affirmatively stating witness' "testimony should be admitted").  Even so, the fact remains that Rule 50(b) speaks to "a *renewed* motion for judgment as a matter of law."  Fed. R. Civ. P. 50(b) (emphasis added).  Further, as *Jones*, 780 F.3d at 487, and *Cornwell Entertainment,* 830 F.3d at 25, make clear, a Rule 50(b) movant must raise the Rule 50(b) argument in a Rule 50(a) motion.  *See Cornwell Ent.*, 830 F.3d at 25 (describing rule as "strict").

The Rule 50(a) motions nowhere address the multiple arguments the Mayor makes regarding the uncertainty and ambiguity in the

verdict form as well as other arguments.  Specifically, they did not address or mention:  (1) the proposed verdict form, including the inclusion of the Tri-Partite Agreement because it was never breached;[21] (2) the expiration of the purchase and sale agreements; (3) Scalera's purportedly hearsay testimony concerning the buyers' withdrawals from their purchase and sale agreements; (4) the lack of harm resulting from a breach of the purchase and sale agreements because Maroney never built the booster station by November 1, 2016, and because the state court held he had until November 1, 2016 to build the station;[22] and (5) the purportedly prejudicial exclusion of the outcome of the state court lawsuit.  The Mayor therefore waived these arguments by not including them in the Rule 50(a) motions.

## 2.  <u>New Trial Waiver</u>

Maroney also argues that the Mayor waived the argument regarding the verdict form's uncertainty under Rule 59(a). Specifically, he maintains that the Mayor's argument is untimely

---

[21] Indeed, the Rule 50(a) motions state, "There is no evidence to support a finding that the Mayor played any role in . . . not *extending* the tripartite agreement."  (D. 189, 193) (emphasis added).

[22] It is true that the Rule 50(a) motions broadly asserted a lack of evidence that the Mayor "caused [Maroney] damages because he had filed [the state court lawsuit] on July 23, 2015."  (D. 189, 193).  This argument, however, does not distinctly raise the argument the Mayor now raises regarding the uncertainty of the verdict form, namely, that there was no harm because the buyers "never would have closed on their homes because [Maroney] did not build the water booster station by November 1, 2016."  (D. 207, p. 8); *see, e.g., T G Plastics Trading Co., Inc. v. Toray Plastics (America), Inc.*, 775 F.3d 31, 39 (1st Cir. 2014) (finding defendant's "general argument" that "damages award was speculative" and not sufficient to put "district court on notice of its costs argument").

because the Mayor did not call the court's attention to the uncertainty in the verdict form during the trial. (D. 219, pp. 6-7, 9-10).

"[A] new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2805 (3d ed. 2012); *see Cool Light Co., Inc. v. GTE Prods. Corp.*, 832 F. Supp. 449, 459 (D. Mass. 1993) (stating "party who acquires information supportive of . . . new trial is precluded from such relief if, rather than presenting the matter promptly to the court, the party awaits the outcome of the trial and then, after losing, for the first time moves for relief"). The court does not agree that the Mayor has waived this argument.

To explain, the court afforded both parties the opportunity to address the proposed verdict form at the charge conference. (D. 211, pp. 82-88). Although the Mayor did not specifically object to the verdict form's use of the word "or" in the first question, he did object to the inclusion of the Tri-Partite Agreement because it was not breached. (D. 211, pp. 83-86, 88). A few excerpts of the Mayor's discussion regarding the verdict form establish the absence of a waiver. (D. 211, p. 83) ("By the way, just to make it clear, the tripartite agreement, it's not renewing it. It's not breaking it. The tripartite agreement was

never broken.  It was just not renewed."); (D. 211, p. 85) ("How can you breach something that's expired?"); (D. 211, p. 86) ("But on the tripartite, there's just no evidence from which the jury could find that the agreement that ended on November 1, 2016 was breached.  It simply . . . wasn't extended.  Thus, it's just impossible for anybody to find a breach, so I think that should just go out."); (D. 211, p. 88) ("Just to be clear, we object."). Hence, the Mayor adequately preserved and did not waive the argument vis-à-vis the Rule 59(a) request for a new trial.[23]  That said, the court finds that the Mayor's argument fails on the merits.

### 3.  <u>New Trial Request</u>

The applicable law is well-established.  When a "special verdict question encompasses multiple claims or multiple theories of liability, one of which is unsupported by the evidence or otherwise defective, 'a new trial is usually warranted.'" *Rodríguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 771 n.17 (1st Cir. 2010); *accord Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 73 (1st Cir. 2009) (stating new trial "usually warranted . . . where a verdict question encompasses multiple theories, one of which is defective")

---

[23] It is also debatable whether a waiver rule applies to the inclusion of the two theories in the verdict question.  *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 30-31 (1st Cir. 2004).  Assuming *dubitante* that it does, there was no waiver.

(citations omitted); *Gillespie*, 386 F.3d at 31.  The rule is nevertheless subject to a "generous harmless error analysis in order to determine whether it is reasonably likely that the jury in fact relied on a theory with adequate evidentiary support." *Rodríguez-Garcia*, 610 F.3d at 771 n.17 (citation omitted). Adhering to that analysis, the First Circuit in *Rodríguez-Garcia* affirmed the denial of a new trial motion because the court was "reasonably sure that the jury found the mayor liable on a direct liability theory" rather than the impermissible indirect theory of liability barred by issue preclusion.  *Id.* at 771.

Here, it is reasonably likely based on the verdict as a whole, including the damages award, as well as the evidence, opening statements, and closing arguments, that the jury found that the Mayor induced a breach of the purchase and sale agreements as opposed to a "breach" of the Tri-Partite Agreement.[24]  *See generally Baron v. Suffolk Cnty. Sheriff's Dept.*, 402 F.3d 225, 243-44 (1st Cir. 2005) (denying new trial motion "because we are reasonably sure . . . [the] verdict rested on the adequately supported" theory based on "jury instructions and the special verdict form as a whole"), *abrogated on other grounds by Jennings v. Jones,* 587 F.3d 430, 438 n.10 (1st Cir. 2009); *Gil de Rebollo v. Miami Heat Ass'ns*

---

[24] For purposes of argument only, the court will assume that the Tri-Partite Agreement could not be breached because it simply expired and was not renewed as to the water booster station.

*Inc.*, 137 F.3d 56, 62 (1st Cir. 1998) (Where, for example, "a jury answers special questions in an inconsistent manner, the trial court's discretion to grant a new trial is broader" and "court can consider all of the circumstances surrounding the jury's verdict, including the amount of the damage award.").

Overall, the damages award on the contractual interference claim ($928,775) strongly and common-sensically suggests that the jury's verdict rested on the four purchase and sale agreements. More specifically, the $928,775 amount bears a strong resemblance to the lost net profit Maroney experienced from buyers canceling the four purchase and sale agreements after the Mayor's August 2015 statements.[25]   Guided by the straight-forward and logical calculation method explained by Maroney's expert (D. 234, pp. 112-117) (Ex. 92, 93, 94), there is a clear way to reconstruct how the jury determined those damages.

To begin, the four purchase and sale agreements reflect purchase prices of $468,728, $545,839, $453,710, and $449,000, which total $1,917,277.  (Ex. 25, 26, 28, 30).  The construction costs of $226,956 for each property total $907,824 for all four properties.  State tax stamps of $2,736 per property result in a total cost of $10,994 for the four properties.  (Ex. 94).  The real estate broker's fee stated in each of the four purchase and

---

[25] The parties proposed and the court gave an instruction based on lost profits. (D. 165, p. 18) (D. 211, p. 141).

sale agreements (either $20,205 or $21,555), when added together, yields a total cost of $82,170 for the four properties.[26] (Ex. 25, 26, 28, 30).  The damages figure ($928,775) strongly suggests that the jury subtracted the construction costs ($907,824) and the broker's fees ($82,170) from the $1,917,277 aggregate purchase price.  This calculates to a lost profit of $927,283, which is within $1,500 of the actual award.[27]  Even if the jury subtracted the state tax stamps ($10,994), the resulting lost profits ($916,289) still closely resembles the actual verdict ($928,775). It is therefore reasonably likely that the jury relied on the breach of the purchase and sale agreements as opposed to the "breach" of the Tri-Partite Agreement in answering the first verdict question.

---

[26] Alternatively, the jury could have calculated the broker's fee based on an agreed fee between Maroney and Scalera of five percent of the base price of each home sold. (D. 238, pp. 28-29).  In or around January 2010, Maroney and Century 21, McLennan & Company entered into an exclusive listing agreement that sets out this commission structure.  (D. 238, p. 28).  Paragraph fourteen of the purchase and sale contracts recites that the expressly listed broker's fees are subject to "a prior fee agreement" (a category that would include the exclusive listing agreement) in the event of a conflict.  Five percent of the base prices in the four purchase and sale agreements yields a total broker's fee of $92,877.  For present purposes, however, this amount is not materially different than the above $82,170 total fee.

[27] The jury could conclude reasonably not to deduct the road construction costs of $35,400 per home or $708,000.  Road construction costs included the cost of water booster station ($250,000), which Maroney did not build, as well as as-built drawings ($20,000), which Maroney incurred before the August 2015 statements by the Mayor.  (D. 201, p. 14) (D. 93).  The jury could also find that Maroney did not incur other road construction costs.  In that regard, Pettis prepared a letter for the Planning Board listing unfinished roadway improvement items, which correspond to road construction costs.  (Ex. 76, 93). His review of a bond for Front Nine Drive calculated the *unfinished* items as totaling $340,589.75.

In this regard, it is difficult if not impossible to fathom how the verdict might have related to a "breach" of the Tri-Partite Agreement where it reportedly resulted in a lost net profit to Maroney of more than $6,000,000.  To state the obvious, there is a wide and insurmountable gulf between the damages connected to the "breach" of the Tri-Partite Agreement and the jury's damages award of $928,775.

It is nevertheless true that the closing arguments focused more on the Tri-Partite Agreement than the purchase and sale agreements.  *See generally Rodríguez-Garcia*, 610 F.3d at 771-772 n.17 (explaining "it is reasonably likely" jury relied on direct liability theory because "evidence and argument at trial focused entirely on" that theory).  Part of the closing arguments, however, focused on matters impactful to both theories, such as the nature of the Mayor's statements.  (D. 211, pp. 99, 109-112).

Most tellingly, though, there remains the sizable monetary gap between the damages attributable to the "breach" of the Tri-Partite Agreement by Maroney's expert and the damages awarded by the jury.  In comparison, there is a strikingly small monetary gap between the lost net profits for the breach of the four purchase and sale agreements and the jury's damages award.  Against this backdrop, the court is convinced it is reasonably likely that the

jury relied on the purchase and sale agreements and not the Tri-Partite Agreement in answering question one on the verdict form.[28]

The issue therefore reduces to whether the induced breach of the four purchase and sale agreements (Ex. 25, 26, 28, 30) had "adequate evidentiary support." *Rodríguez-Garcia*, 610 F.3d at 771 n.17 (applying "generous harmless error analysis in order to determine whether it is reasonably likely that the jury in fact relied on a theory with adequate evidentiary support." (quoting *Mass. Eye and Ear*, 552 F.3d at 73)); *Gillespie*, 386 F.3d at 30 (same). Conversely, if the evidence was insufficient to support the induced breach of these purchase and sale agreements, adequate evidentiary support is lacking. *See Gillespie*, 386 F.3d at 30 (citing *Davis v. Rennie,* 264 F.3d 86, 106 (1st Cir. 2001), to support principle of generous application of harmless error standard to rescue verdicts where court "could be *reasonably sure* that the jury in fact relied upon a theory with adequate evidentiary support"); *Davis*, 264 F.3d at 106 (finding "evidence was *insufficient* to support" unreasonable restraint finding and

---

[28] The Mayor makes an additional argument regarding an induced breach of the Tri-Partite Agreement. Specifically, he maintains that if the jury found an induced breach, "it would conflict with the finding by the State Court that [Maroney was] required to build the water booster station prior to the expiration of the Tri-Partite Agreement," i.e., by November 1, 2016. (D. 207, pp. 7-8). Because it is reasonably likely that the jury did not rely on an induced breach of the Tri-Partite Agreement, it is not necessary to address this argument.

"ask[ing] whether we can be *reasonably* certain that the jury's verdict did not rest on this erroneous basis") (emphasis added).

With regard to the sufficiency of the evidence, the Mayor argues there was no competent evidence that he induced a breach of the purchase and sale agreements, particularly where the purchase and sale agreements were expired and Scalera's testimony was hearsay.  (D. 207, p. 8).  As to the former argument, Scalera testified that *at the time* of the August 2015 Crystal Springs meeting, she had nine purchase and sale agreements.  (D. 238, p. 35) ("At the time, we had nine Purchase and Sale Agreements with buyers that were waiting to have homes built there.").  Accordingly, there is sufficient evidence that the purchase and sale agreements were not expired.[29]

Relatedly, the Mayor submits there was no testimony from the actual buyers concerning why they did not purchase the homes.  (D. 207, p. 8).  This is true.  But even so, other evidence in the record provides adequate support to suggest that they withdrew from their purchase and sale agreements because of the Mayor's statements.

First, the Mayor's statements were emphatic, forceful, and unequivocal:  Maroney "knows what he has to do" and that if he drops the state court "lawsuit, he'll get the permits."  Second,

---

[29] The hearsay argument is addressed and rejected in section V(E) below.

the Mayor's statement that Maroney will have his permits when he "drops his lawsuit" had an impact on Deyermond, who was shocked, very surprised, and viewed the statement as extortion.  Given the tenor of the statements against the backdrop of Deyermond's reaction, it is more than likely the Mayor's statements had an impact on other attendees.  (D. 201, p. 67).  In fact, the DiLorenzos and the Prestons, who attended the meeting, canceled their purchase and sale agreements *shortly* after the meeting.  (D. 238, pp. 37, 49-50) (D. 243, pp. 96-97) (D. 201, pp. 35, 40-41). Third, in connection with the Mayor's statements at the meeting, Scalera testified, based on her understanding from observations, that the DiLorenzos withdrew from their purchase and sale agreement because they had lost confidence that the sale would occur, and she similarly had the sense that other buyers were also feeling uncertain because of what the Mayor said.[30]  (D. 201, p. 41).

In addition, the jury could have readily concluded that the Mayor was not a credible witness.  To that end, although he denied

---

[30] The testimony reads as follows:

> Q.  Mrs. Scalera, what is your understanding, based on your observations of the DiLorenzos, as to whether the Mayor's comment at the meeting had anything to do with their decision to withdraw and ask for return of all their funds?

> A.  They had lost confidence that the sale would occur, that the building would begin.

(D. 238, p. 48).

making the statements, four different witnesses (Scalera, Deyermond, Healey, and Maroney) testified that the Mayor made the statements.

In short, the foregoing and other evidence in the trial record provides adequate and sufficient evidentiary support for the jury to have found that the Mayor's statements induced the buyers of the four properties to cancel their purchase and sale agreements (Ex. 25, 26, 28, 30). Relatedly, the record includes sufficient evidence that the Mayor knew about these purchase and sale agreements because Scalera referred to them during the Crystal Springs meeting with the Mayor. (D. 238, p. 38) ("I said that I was here with residents of Front Nine Drive and some buyers who were in contract to build some of the homes at Crystal Springs."); (D. 238, p. 38) ("I said that we had nine contracts and most of those buyers had already sold their home[s] and they were living in temporary housing.").

Next, as noted, the Mayor argues that Maroney failed to demonstrate harm as a result of the buyers withdrawing from the purchase and sale agreements because of the Mayor's statements. (D. 207, p. 8). In particular, the Mayor asserts that even if the buyers had not withdrawn from the purchase and sale agreements because of the Mayor's statements, Maroney did not build and could not have built the water booster station by November 1, 2016. The Mayor adds that Ward never signed off on the permits for those

homes.   (D. 207, p. 8).   As such, the buyers never would have closed on their homes, according to the Mayor.   (D. 207, p. 8).

Maroney counters that the Mayor's tortious interference was complete when the buyers canceled their purchase and sale agreements, which caused Maroney to lose each deposit and potential sale.   (D. 219, p. 15).   The Mayor, in turn, responds by quoting Ward's testimony that as of January 5, 2016, Maroney would not have been able to complete the water booster station by November 1, 2016 using either a stick-built design or a factory-built pump manufactured by EFI.   (D. 230, pp. 2-3) (D. 220, pp. 57-58).

Here again, the Mayor's arguments are not convincing.   For starters, in estimating the time to complete the water booster station, the jury could have found that Ward was not a credible witness.   In that regard, Ward was asked a question about how long it would take Maroney from beginning the design to finishing the water booster station.   Ward answered, "I mean, typically 18 months or so."   (D. 226, p. 157).   Yet, in a June 2012 email to a Parsonage Hill resident, Ward estimated roughly one or two months for a design, three to four months for equipment delivery, and a couple of months for construction, i.e., roughly seven or eight months.   (Ex. 9).

In addition, a jury could easily find that Maroney suffered harm when, for example, the DiLorenzos and the Prestons canceled their purchase and sale agreements shortly after the Crystal

Springs meeting.   Given the short time between the Mayor's statements and their cancelations, the jury could also conclude that the Mayor, the top official in charge of the City, acted independently of Ward in causing their cancelations.   In other words, the short time-period supports the jury finding that the DiLorenzos' and the Prestons' cancelations shortly after the Mayor's statements operated independently of Ward not signing off on the building permits at some undefined point in the future and Maroney not building the booster station by November 1, 2016.   At a minimum, sufficient evidence exists that Maroney was harmed by the loss of their deposits and the potential net proceeds from the sales of the homes.

In sum, it is reasonably likely that the jury determined that the Mayor interfered with the four purchase and sale agreements as opposed to determining a "breach" of the Tripartite Agreement.   As discussed, sufficient evidence supports the jury's findings.   The Mayor's arguments regarding the uncertainty and ambiguity engendered by the word "or" in question one of the verdict form are not convincing.

## C.   <u>Inconsistency in Verdict</u>

The Mayor next argues that the jury's finding in his favor on the prospective business relationship claim is inconsistent and cannot be reconciled with the jury's finding in Maroney's favor on

the contract interference claim.[31]  (D. 207, pp. 13-14).  According
to the Mayor, the inconsistency arises because each finding depends
on the same actions by Ward, i.e., his refusal to sign off on
permits after March 2015, his action regarding the change to the
EFI design, and his recommendation against extending the Tri-
Partite Agreement.  (D. 207, pp. 13-14).  With respect to the
contract interference claim, the Mayor reasons that "even if the
individuals" with existing "purchase and sale agreements had not
backed out of those agreements after the Mayor's" statements,
Ward's actions would have prevented them from closing on their
homes.  (D. 207, p. 14).  With regard to the business relationship
claim, Ward's actions similarly would have prevented Maroney from
entering "into contracts with prospective homeowners," according
to the Mayor.  (D. 207, p. 14).  In short, per the Mayor's argument,
"the jury found that the Mayor interfered with an existing
contract" (a purchase and sale agreement or a Tri-Partite
Agreement) but then inconsistently found that he "did not interfere
in any *prospective* business relations, presumably any future sale
of homes or a new Tri-Partite Agreement." (D. 207, p. 13).  Maroney
counters that the Mayor acted independently of Ward and that the
prospective business relationships with future buyers were too
remote or speculative.

---

[31] The Mayor fails to cite a case or any other legal authority for the argument.
(D. 207, pp. 13-14).

By way of background, the jury answered "yes" to question three, which pertains to the contractual interference claim, and "no" to question nine, which pertains to the business relationship claim.[32]   Both questions addressed a similar subject, namely, whether the Mayor intentionally induced another party not to perform the contract's obligation or the buyers not to enter or continue the prospective business relationship.   The jury charge thus connected an instruction regarding the Mayor's knowledge, intent, and improper motive or means to both claims.   (D. 211, p. 143, ¶ 2).

In civil trials, there is a substantial and significant reluctance to order a new trial based on an inconsistency in the

---

[32] Questions three and nine read as follows:

> 3. With respect to any contract to which you found the required knowledge, do you find, by a preponderance of the evidence, that the Mayor intentionally induced or persuaded another party to that contract not to perform the party's obligations under that contract?
>
> Answer: <u>Yes</u>
>
> 9. Do you find, by a preponderance of the evidence, that the Mayor intentionally induced or caused the buyers not to enter into or continue the prospective relationship, or prevented Mr. Maroney from acquiring or continuing the prospective relationship?
>
> Answer: <u>No</u>

(D. 197).   Question three tracks a joint instruction proposed by the parties and included in the jury charge.   (D. 165, pp. 5-6) (D. 211, p. 38).   Question four tracks a proposed instruction by Maroney, which the jury charge also included.   (D. 165, p. 19) (D. 211, p. 142).   The Mayor did not object to the language in this proposed instruction at the charge conference.   As an aside, the Mayor's proposed verdict form is deficient for various reasons including that it elevated certain facts to the exclusion of others.   (D. 219, p. 11, ¶ 1) (D. 192).

verdict form. *See Davignon v. Hodgson*, 524 F.3d 91, 109 (1st Cir. 2008) (noting "reluctan[ce] to order a new trial on the basis of inconsistent jury verdicts" and court's "attempt to reconcile the jury's findings, *by exegesis if necessary*") (emphasis added) (citation omitted); *Connelly v. Hyundai Motor Co.*, 351 F.3d 535, 540 (1st Cir. 2003) (recognizing "substantial reluctance to consider inconsistency in civil jury verdicts a basis for new trials") (citation omitted). For example, "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *ITyX Sol.AG v. Kodak Alaris, Inc.*, 952 F.3d 1, 11 (1st Cir. 2020) (citing *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)). In other words, the analysis does not "search for *one possible view of the case* which will make the jury's finding inconsistent." *Atl. & Gulf Stevedores,* 369 U.S. at 364 (further noting that such a search would "result[] in a collision with the Seventh Amendment") (emphasis added) (citations omitted).[33]

In the court's view, there was no inconsistency between the jury's verdict in Maroney's favor on the contractual interference claim and the jury's verdict in the Mayor's favor on the business

---

[33] Somewhat contrarily, the Mayor adheres to one primary view of the case - that Ward's conduct of "refus[ing] to sign off on permits after March 2015[,]" changing to the EFI design, "and recommend[ing] against the extension of the Tri-Partite Agreement" rendered the verdicts irreconcilable. (D. 207, pp. 13-14, ¶ D).

relationship claim.  Rather, the jury's answers to questions three and nine and, more broadly, the jury's verdicts on the contractual interference and the business relationship claims each have a basis in the evidence.  *See Connelly v. Hyundai Motor Co.*, 351 F.3d 535, 541–542 (1st Cir. 2003) (reconciling verdicts because "'jury's efforts to apply the instructions were understandable and had some basis in the evidence") (citation omitted).

On the contractual interference claim, the jury reasonably could have found that the Mayor interfered with the four purchase and sale agreements *independent* of Ward's actions.  The repeated and forceful nature of the Mayor's statements, the close proximity between the statements at the Crystal Springs meeting and the DiLorenzos' and the Prestons' cancelations, and the Mayor's status as the top City official support such a finding.

In contrast, on the business relationship claim, the jury reasonably could have limited the claim to *future* buyers with a prospective business relationship in the form of *future* purchase and sale agreements with Maroney.[34]  The Mayor's statements took place in August and September 2015.  Hence, the jury could have

---

[34] To that end, the jury answered "yes" to question seven, which asked, "Do you find, by a preponderance of the evidence, that Mr. Maroney had a prospective business relationship with prospective buyers with the probability of future economic benefit for Mr. Maroney?"  (D. 197, No. 7).  In answering this question, the jury reasonably could have limited the "prospective business relationship" to future purchase and sale agreements "with prospective buyers" as opposed to including the four existing purchase and sale agreements the jury found applied to the contractual interference claim, as previously discussed.

found those statements too remote in time and too speculative to induce or cause those future buyers not to enter into those future purchase and sale agreements to buy the homes.  Accordingly, the jury answered "no" to question nine.  Moreover, it is the remoteness of the Mayor's comments rather than "Ward's refusal to sign off on permits," as argued by the Mayor, that could have led the jury to answer question nine "no" and thus find for the Mayor on the business relationship claim.

The same remoteness concern applies if the jury reasonably interpreted the prospective business relationship as being the future buyer's *purchase* of the home rather the prospective business relationship of entering into a future purchase and sale agreement. Those circumstances are just as remote and, perhaps, even more remote, than entering into the future purchase and sale agreement for that home.  In short, given the *substantial* reluctance to order a new trial based on inconsistent verdicts in civil trials and that reconciliation is obtainable by *exegesis*, if necessary, the foregoing reconciles the verdicts.

Separately, even assuming the Mayor's singular view of the evidence as based on Ward's actions[35] was the only possible view of the case the jury could adopt, which it was not, and that it

---

[35] To repeat, the Mayor points to Ward's actions of refusing to sign off on permits, changing to the EFI design, and recommending against extending the Tri-Partite Agreement.  (D. 207, pp. 13-14).

rendered the two verdicts inconsistent, the Mayor's failure to object to the reportedly inconsistent verdicts triggers an iron-clad rule in the First Circuit that dooms the Mayor's argument here.  That rule required the Mayor to object to the inconsistency before the court discharged the jury.

To explain, objections to the inconsistency of verdicts under Federal Rule of Civil Procedure 49(b) ("Rule 49(b)") "must be made after the verdict is read and before the jury is discharged." *Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 63 (1st Cir. 2002) (stating foregoing as prior holdings in First Circuit cases and finding defendant's failure to object to general verdict constituted forfeiture) (citations omitted).  Further, a forfeiture results from a failure to object to general verdicts as well as to general verdicts with written interrogatories upon one or more issues of fact.  *See id*. at 63 & n.1 (If verdict was general verdict with written questions under Rule 49(b) or, alternatively, two general verdicts, objections to inconsistency should have been raised before jury was discharged.).[36]  A similar

---

[36] It is therefore not necessary to delineate whether the verdict form constituted two or more general verdicts or a general verdict with special written questions with one or more issues of fact.  Under either scenario, the Mayor should have objected at the critical time, namely, the time when the court could have addressed the error and asked the jury to return to its deliberations. *See id*. at 64 (noting "[t]o decide otherwise would countenance 'agreeable acquiescence to perceivable error as a weapon of appellate advocacy'") (citation omitted).
    As an aside, the questions in the verdict form in *Babcock* were *more* general or global than the questions in the verdict form in this case.  *See Babcock*, 299 F.3d at 63 (asking "[h]as plaintiff proved her negligence claim by a preponderance of the evidence?").  The *Babcock* verdict questions also did not

rule applies to special verdicts.[37]  *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 59 (1st Cir. 2016) (citation omitted); Fed. R. Civ. P. 49(a).

The requirement to object to an inconsistent verdict is "an 'iron-clad rule' in" the First Circuit.  *Nexium*, 842 F.3d at 59 (citing *Rodriguez-Garcia v. Mun. of Caguas*, 495 F.3d 1, 9 (1st Cir. 2007)).  The justification for this iron-clad rule is that "the 'only efficient time to cure the problem is after the jury announces its results and before it is excused, and it is the responsibility of counsel to make timely objection.'"  *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 73 (1st Cir. 2021) (citation omitted).

Thus, after the court read the verdict and asked counsel if they wished to poll the jury, it was incumbent upon the Mayor's counsel to raise the issue of any inconsistency in the jury's answers at that time before the court excused the jury.  The fact that the court did not ask the parties if they had any concerns

---

include an issue of fact.  *See id.; see also Trull v. Volkswagen of Am., Inc.*, 320 F.3d 1, 4 (1st Cir. 2002) ("Although there were no written interrogatories submitted to the jury, it is clear that the two liability questions submitted to the jury were general verdict forms under Rule 49(b)."). Yet, the court in *Babcock* still concluded that the verdict questions were either two general verdicts or a Rule 49(b) general verdict with special written questions on one or more issues of fact.  *See Babcock*, 299 F.3d at 63 & n.1; Fed. R. Civ. P. 49(b)(1).

[37] The form used in this case was not a special verdict.  *See Babcock*, 299 F.3d at 63 (stating similar, albeit more general, verdict form was not a Rule 49(a) special verdict).

about the verdict form before excusing the jury is immaterial.
*See Trainor v. HEI Hosp., LLC*, 699 F.3d 19, 34 (1st Cir. 2012)
(rejecting argument that party did not waive claim of inconsistency
because "district court never inquired as to whether any party
wished to comment").  Further, the Mayor did not object even though
the instructions and the verdict form, which the Mayor had at the
charge conference, foreshadowed a potential inconsistency if the
jury answered question three affirmatively and question nine
negatively.[38]  *See Howard v. Antilla*, 294 F.3d 244, 250-251 (1st
Cir. 2002) (finding forfeiture based on failure to object to
inconsistent verdicts on two claims before jury discharged given
close similarity between defamation and false light claims such
that "Antilla 'should have observed that there could be no "either-
or"'") (citing *Merchant v. Ruhle*, 740 F.2d 86, 91 (1st Cir. 1984)).
The potential foreshadowing arose because both questions pertain
to the Mayor's intentional inducement; and the jury charge on the
business relationship claim directed the jury to consider the
instructions on the contractual interference claim as to
"knowledge, intent, or improper motive or means."  (D. 211, p.
143).

Further still, had the Mayor objected, the court could have
asked the jury to reconsider its answers to questions three and

---

[38] *See supra* note 32.

nine.  Moreover, in doing so, the court could have reminded the jury about the instruction connecting the elements of each claim with respect to knowledge, intent, and improper motive or means.

Although this failure forfeits any claim of inconsistency, the Mayor had a second opportunity to raise the issue when, immediately after excusing the jury, the court asked the parties if they wished to raise anything.  Both Maroney's and the Mayor's counsel responded that they did not wish to raise anything.  (D. 231, pp. 7-8).  Relatedly, the court had the authority to reconvene the jury at that time because only two or three minutes had passed, the jurors were in the process of returning to the jury room to collect their belongings, and it is unlikely they had spoken to anyone regarding their deliberations.  *See Dietz v. Bouldin*, 579 U.S. 40, 42 (2016) ("hold[ing] that a federal district court has the inherent power to rescind a jury discharge order and recall a jury for further deliberations after identifying an error in the jury's verdict" in a civil case); *id.* (Ability to rescind discharge order "is limited in duration and scope and must be exercised carefully to avoid any potential prejudice.").

In sum, the verdicts can be reconciled based on the evidence in the record.  In any event, the Mayor's failure to object after the jury returned the verdict and before the court discharged the jury forfeited his inconsistency challenge.  Per the foregoing, the Mayor's inconsistency arguments do not merit a new trial.

53

## D.   <u>Summary Judgment Findings</u>

The Mayor seeks a Rule 50(b) judgment as a matter of law and a Rule 59(a) new trial because the summary judgment findings should have ended the case.  Having set out the basis for his argument and Maroney's rejoinder in opposition, it is not necessary to repeat the parties' positions in detail.  The procedural background recites the multiple times that the Mayor reiterated the argument including seeking review by way of the motion for reconsideration. Accordingly, the court proceeds to the merits of the parties' arguments.

### 1.   <u>Rule 50(b) Request</u>

At the outset, Maroney contends that the Mayor failed to raise the summary judgment argument in the Rule 50(a) motions. He is mistaken.  Although brief, the Rule 50(a) motions recite:

> In addition to the lack of evidence at trial, the Court previously determined that Ward acted appropriately when it granted his motion for summary judgment.  Finally, at the trial of this case, the Plaintiff has actually adduced less evidence against the Mayor than submitted to the Court at summary judgment.

(D. 189, 193).  Placed in the context of the Mayor's repeated presentations of the same argument founded on Rule 56(g) and the law of the case, the Rule 50(a) motions were sufficiently specific to apprise this court of the basis of the argument.  *Cf. T G Plastics*, 775 F.3d at 39 (finding defendant's "general argument that the requested damages award was speculative" was "too vague

to encompass the costs argument, *especially since the issue had not been raised to the court or to the jury at any earlier point*") (emphasis added).  Accordingly, the Mayor did not waive the Rule 50(b) argument regarding the preclusive effect of the summary judgment finding.

The Rule 50(b) argument nevertheless lacks merit.  The Mayor relies on the court's summary judgment findings that "a reasonable juror could not find that Ward was following the Mayor's directives in changing to the EFI design in January 2016 and opposing the extension of time to build the water booster station during the September and October Planning Board meetings" in connection with the substantive due process claim.  (D. 127, p. 42).  The Mayor additionally cites to the related summary judgment finding made with respect to the conspiracy claim.  (D. 127, p. 61).  He submits that these findings precluded a trial on the contractual interference claim.  The evidence at trial, as contended by the Mayor, was essentially the same as presented to the court on summary judgment.  Maroney maintains the evidence differed at trial.  Maroney is correct.

First, it is a "common-sense 'procedural fact' that the record fully develops between any proffered summary judgment motion and trial."  *Jones*, 780 F.3d at 488.  Although the Rule 50(a) "standard largely 'mirrors' the summary-judgment standard, the *difference*" is "that district courts evaluate Rule 50(a) motions in light of

the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731-732 (2023) (emphasis added).  It is therefore "*unremarkable* to grant a party's motion for judgment as a matter of law after having denied that party's motion for summary judgment." *Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas*, 982 F.3d 20, 26 (1st Cir. 2020) (emphasis added) (citations omitted).  Again, this is because the evidence considered for each motion is different:  "motions for summary judgment are decided based on affidavits and other pretrial filings, whereas motions for judgment as a matter of law are 'decided on the evidence that has been admitted' at trial."  *Id.* at 27 (citation omitted). Whereas the "bodies of evidence may be similar, . . . in the typical case . . . they are not identical." *Id.*

This action is a typical case.  The evidence and the record on summary judgment were similar to the evidence and record at trial, but also differed in material respects.  Certain exhibits were the same, but a number were different.  To the latter point, the trial record included the four purchase and sale agreements whereas the summary judgment record did not.  The summary judgment record also included depositions by a number of the witnesses at trial.  Although the deposition testimony and the trial testimony of these witnesses covered similar topics, the questions and answers at trial were not always the same.  Moreover, the trial included witnesses (Dennis, Lewis, and Smith) whose depositions

are absent from the summary judgment record.  Smith was the individual who reviewed and approved water service applications for the houses.  Unlike the summary judgment proceeding, the jury could assess the credibility of the witnesses at trial.[39]  *See Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 689 (1st Cir. 2023) (noting "uncontroversial rule that at summary judgment there is 'no room for credibility determinations'").

In short, the summary judgment factual findings the Mayor identifies were not binding at trial.  Allowing the Rule 50(b) request based on Mayor's summary judgment argument is thus not warranted.

### 2.  **New Trial Request**

The Mayor also seeks a new trial based on the summary judgment findings "that a reasonable juror could not find that Ward was following the Mayor's directives in changing to the EFI design . . . and opposing the extension of time to build the water booster station" before the Planning Board.  (D. 207, pp. 9-11).  For substantially the same reasons with respect to the Rule 50(b) request, a new trial is not warranted.

In brief, this is a typical case.  The summary judgment record was similar but certainly not identical to the trial record.

---

[39] As an aside, the court repeatedly advised the parties not to rely on facts set out in the summary judgment opinion as established or binding for purposes of the trial, including the factual finding that a reasonable juror could not find that Ward was following the Mayor's directives.  (D. 149, pp. 2, 4, 6-13, 22).

Further, the jury could and likely did make credibility judgments. In all, the Mayor's summary judgment argument fails to convince the court that the verdict was against the law or a miscarriage of justice.

## E. <u>Hearsay Evidence</u>

As earlier noted, the Mayor argues that Scalera's testimony about why the buyers with the four purchase and sale agreements did not purchase the homes is hearsay. As a reminder, Scalera testified about her understanding, based on her observations, that the DiLorenzos withdrew from their purchase and sale agreement because they had lost confidence that the sale would occur in light of the Mayor's comments at the Crystal Springs meeting. (D. 238, p. 48). Based on her understanding from observations, she also had the sense that other buyers were feeling uncertain because of the Mayor's statements. (D. 201, p. 41).

Scalera's testimony was founded upon her observations. As such, it not hearsay. *See Cole v. Maine Off. of Info. Tech.*, 17-cv-00071-JAW, 2018 WL 4608478, at *12 n.37 (D. Me. Sept. 25, 2018) ("Mr. T.'s observations about how Ms. Gordon was reacting to Mr. Karstens are not hearsay, because they are Mr. T.'s own direct observations and within his personal knowledge."); *see also United States v. Soto-Beniquez*, 356 F.3d 1, 36 (1st Cir. 2003) ("Officer Rosa-Lopez did not testify about an out-of-court statement, *see* Fed. R. Evid. 801(c), but about his personal observation of the

results of the field test."); *Mackey v. Town of Tewksbury*, Civil Action No. 15-12173-MBB, 2020 WL 68243, at *2 (D. Mass. Jan. 7, 2020) ("[P]laintiff's observation of his father not allowing the officers to enter the house is based on plaintiff's personal knowledge and is not a statement within the meaning of the hearsay rule.") (citing Fed. R. Evid. 801(a)).   Similarly, Scalera's understanding of why the buyers did not purchase the homes is not hearsay.  *See Glenwood Farms, Inc. v. Ivey*, No. 03-217-P-S, 2005 WL 2716497, at *8 n.27 (D. Me. Oct. 20, 2005) ("Berry's sworn statement" in summary judgment affidavit "about his own understanding  is  not  hearsay.").   Accordingly,  Scalera's understanding, based on her observations, of why the buyers with the four purchase and sale agreements did not purchase the homes is not hearsay.  The Mayor's argument to the contrary lacks merit.

## F.   <u>State Court Lawsuit</u>

The Mayor makes two arguments relative to the state court lawsuit.  The court examines the arguments seriatim.

In the first argument, the Mayor maintains that he did not cause Maroney any harm because the state court held that the City could withhold the permits until the water booster station was built and Maroney had until November 1, 2016 to build it.  (D. 207, p. 12).  Maroney argues in response that the contractual interference claim "was complete when the buyers canceled their"

purchase and sale agreements, which caused Maroney to lose the deposits and the potential sales.  (D. 219, pp. 14-15).

Based on collateral estoppel of an issue in the state court decision, this court previously determined that Maroney agreed to build the station after completing Phase I, which was earlier than November 2016.  (D. 77, p. 12).  This court thus "adopt[ed] the state court's finding that [Maroney] agreed both that a water booster station was necessary and that he would build the station after completing Phase I."[40]  (D. 77, p. 12) (D. 97-1, p. 19) (D. 77, p. 6).

The Mayor's first argument does not warrant a new trial.  The established fact that Maroney agreed to build the station before November 2016 does not eliminate or foreclose the harm to Maroney already caused by the Mayor's statements, namely, the loss of the deposits and potential home sales.  As explained in section V(B)(3), there was adequate and sufficient evidence for the jury to find that the Mayor's statements induced the DiLorenzos and the Prestons to cancel their purchase and sale agreements well before November 2016.  The same is true for the Rainvilles' cancelation, which "took a little longer" than the DiLorenzos' and the Prestons'

---

[40] This court did not apply collateral estoppel to a related state court finding. That finding determined that, "to the extent Maroney was seeking permits enabling him to start construction on lots that Water Department considered unserviceable without the booster station, . . . the Department was free to deny those permits, no matter the date, until the booster station was constructed." (D. 97-1, p. 19).

cancelations.  (D. 243, p. 97).  As for the Dalys' cancelation, the voided check with the "Deposit return" memo is dated May 19, 2016, also well before November 2016.  (Ex. 24).  Based on the evidence, the jury could conclude that the Mayor induced the buyers' cancelations and thereby harmed Maroney due to the loss of deposits and potential home sales reflected in the four purchase and sale agreements.  Moreover, the evidence allowed the jury to find that this took place well before November 1, 2016.  Put another way, irrespective of the City's ability to withhold permits until November 2016, the jury could find, based on sufficient evidence, that the Mayor's statements independently caused the harm to Maroney and did so well before November 2016.

The Mayor's second argument likewise fails to merit a new trial.  The Mayor submits that this court erred by allowing the jury to hear the state court's finding at the preliminary injunction stage that Maroney "had a likelihood of success on the merits of his claims" while excluding prejudicially the outcome of the state court proceeding.  (D. 207, p. 12).[41]  The exclusion also significantly prejudiced the Mayor, or so he contends, because it

---

[41] The jury heard the likelihood of success finding when this court instructed the jury on the third day of the trial (August 10, 2023) that, in conjunction with the state court judge denying the preliminary injunction, he "also said . . . that 'The plaintiffs have shown a likelihood of success on the merits of their contractual claims.'"  (D. 207, p. 12) (citing the August 10, 2023 trial transcript at pp. 87-91) (D. 202, pp. 90-91).  The factual background quotes the complete instruction.

prevented the jury from being fully informed of the facts pertaining to this action, namely, that that the City could properly withhold the permits and that Maroney had until November 1, 2016 to build the water booster station.[42]  As indicated in Maroney's response in opposition, this court weighed and balanced the relevance against the confusion and unfair prejudice that would result by the admission of testimony regarding the 2018 outcome and findings therein – namely that Maroney's claims generally lacked merit - under Federal Rule of Evidence 403 ("Rule 403").

By way of background, the court addressed the limitations regarding testimony about the state court lawsuit on several occasions.  On each occasion, whether implicitly or expressly, this court considered the testimony under the balancing construct of Rule 403.  For example, during the final pretrial conference, this court noted the need of the party seeking admission of a state court ruling to articulate "why under 403 its probative value outweighs the risk of confusion of prejudice to the other side." (D. 179, pp. 32-33, 38) (D. 179, p. 32) (stating jurors are "laypeople who may have a hard time understanding what to make of

---

[42] As stated earlier, the state court made a finding that "to the extent Maroney was seeking permits enabling him to start construction on lots that the Water Department considered unserviceable without the booster station, . . . the Department was free to deny those permits, no matter the date, until the booster station was constructed." (D. 97-1, p. 19).  This court also made the collateral estoppel finding that Maroney agreed to build the booster station after completing Phase I, which was earlier than November 2016.

a ruling by basically another sovereign on this case").  During the trial, this court reiterated the basis for limiting the testimony regarding the state court lawsuit.  (D. 202, pp. 16) ("I would think that would be confusing to the jury.  What do we make of the fact that he lost the state case? . . . I would say yes, this footnote [in the pretrial memorandum] has generated a lot of confusion.  But I think in fairness to Mr. Maroney -- it can't be interpreted now to allow you to get him to concede that, at a later date, there was a finding the city could properly withhold the permits, because I think it's not really relevant.  And I think it's going to confuse the jury and I think it would be prejudicial.").[43]  Similarly, when the parties expressed a desire to broaden the testimony regarding the state court lawsuit specific to the preliminary injunction proceeding on day three of the trial, the court expressed similar concerns.   (D. 238, p. 7) ("Help me understand how this isn't going to confuse the jury" and "my worry here" is "that somebody's going to say because the Court ruled a certain way here, I'm not telling you explicitly but I'm suggesting to you it should affect how you're going to rule here.").

Rule 403 endows the court with discretion to "exclude relevant evidence if its probative value is substantially outweighed by a

---

[43] The Mayor cites certain pages of the trial transcript, including the above page, in presenting the second argument.  (D. 207, p. 12) (citing D. 202, pp. 1-18, 58-59, and 87-91).

danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403; *see Ellicott v. Am. Capital Energy, Inc.*, 906 F.3d 164, 172 (1st Cir. 2018) (stating "[d]istrict courts have wide discretion when it comes to determinations under Rule 403"). Here, the relevance of the outcome of the state court lawsuit *in 2018* which the defendants prevailed on the merits is, at most, minimal and, more likely, nonexistent. The 2018 result that the defendants prevailed in the state court lawsuit does not inform the parties' state of mind in 2015 and 2016.

In comparison, admitting the information risked significant and substantial confusion to the jury. For example, it carried the decided risk of the jury affording undue weight to the state court's outcome in the defendants' favor and carried the risk that it would persuade or suggest to the jury to find in favor of the defendant in this action, the Mayor. In addition, informing the jury that Maroney lost the state court case years later against different defendants, i.e., not the Mayor, carried the risk of confusing the issues and misleading the jury of what to make of that finding in the context of this case.

Case law supports a Rule 403 exclusion of rulings by other courts on the basis of unfair prejudice, confusion, and misleading the jury. For example, as determined in *Haynes v. Acquino*, 771 Fed.Appx. 75, 76-77 (2d Cir. 2019) (unpublished), "the district

court did not abuse its discretion in holding that the probative value of the state court's ruling on probable cause was substantially outweighed by the danger of its prejudicial impact and potential to confuse the jury."  Afterall, as reasoned in *Haynes*, "a jury might place undue emphasis on a court order simply because a judge issued it, and that introducing an order might confuse the issues and mislead the jury."  *Id.* at 77 (internal brackets omitted) (citation omitted).

Similarly, the court in *Williams v. O'Connor*, Civil Action No. 14-02667017, 2017 WL 445748 (E.D. Pa. Feb. 2, 2017), excluded evidence of a state court's decision to suppress evidence seized during a traffic stop.  *Williams* involved a section 1983 claim alleging that a police officer violated Williams' Fourth and Fourteenth Amendment rights by stopping and searching him during that same traffic stop.  The court excluded the evidence under Rule 403 because the decision's probative value, if any, was "substantially outweighed by unfair prejudice and risk of confusing the jury."  *Id.* at *3.  The court deduced that:

> Williams's § 1983 claim is distinct from the initial criminal case; the suppression decision occurred in a separate proceeding between different parties.  A previous decision by a judge may foreclose the issue for the juror, despite the fact that it will be the jury's duty in this case to determine whether reasonable suspicion existed.

*Id.*  The reasonings in *Hayes* and *Williams* apply equally to this case.

Likewise, the court in *Thomas v. O'Brien*, 539 Fed.Appx. 21 (2d 2013) (unpublished), upheld the lower court's exclusion under Rule 403 of a state criminal court's finding that the plaintiff's Fourth Amendment rights were violated in the plaintiff's subsequent civil rights "lawsuit[] alleging excessive force and Fourth Amendment violations." *Id.* at 22. The lower court in *Thomas* found that "the evidence, although somewhat probative, was substantially outweighed by its prejudicial value and potential to confuse the jury." *Id.*

In sum, notwithstanding the Mayor's argument to the contrary, this court properly weighed and balanced the relevancy of the information and determined it was substantially outweighed by the danger of unfair prejudice and confusion of the issues as well as misleading the jury in this case. As such, the argument does not warrant a new trial.

**IV.   CONCLUSION**

In accordance with the foregoing discussion, the motion for judgment as a matter of law or, in the alternative, for a new trial (D. 206) is **DENIED**.

/s/ Donald L. Cabell
DONALD L. CABELL, Chief U.S.M.J.

DATED:  May 1, 2024